[No. B031644. Second Dist., Div. Two. Dec. 16, 1988.]

STEVEN GROSS et al., Plaintiffs and Respondents, v.
JAMES A. RECABAREN et al., Defendants and Appellants.

**COUNSEL**

Schmid & Grogman, Susan H. Schmid, Thelen, Marrin, Johnson & Bridges, Curtis A. Cole and Mary R. Barnett for Defendants and Appellants.

Bruce G. Fagel and Evan A. Gould for Plaintiffs and Respondents.

OPINION

GATES, J.—Defendants H. William Fister, M.D., Inc. and James A. Reca-
baren, M.D., Inc., the professional corporations of surgical oncologists H.
William Fister and James A. Recabaren, appeal from an order denying their
petition to stay further proceedings and compel arbitration of the medical
malpractice action instituted by their patient Steven Gross and his wife
Nancy Gross, who sought to recover damages for loss of consortium. They
contend: "I. This court is not bound by the superior court's error in con-
struction of the arbitration agreement. II. This dispute over the fifth of Mr.
Gross' seven surgeries falls squarely within the scope of the arbitration
agreement because the surgery was performed during the course of a contin-
uous physician-patient relationship. III. The physicians have a right to arbi-
trate this case."

The pertinent facts are undisputed. On August 16, 1984, Steven Gross
accompanied his wife, who had been a patient of Dr. Fister for two and one
half years, to Fister's office for her checkup. During that visit, Gross himself
arranged for the excision of a mole from the left side of his scalp and a cyst
from the base of his scalp. These two procedures were performed on August
16 and August 23, respectively, but only after Gross had been asked to, and
did, sign a written agreement to submit to arbitration "any dispute as to
medical malpractice." Biopsies disclosed both growths to be benign and
Gross received no further treatment for these conditions after the last su-
tures were removed on September 11, 1984. At that time, Dr. Fister entered
the following notation on Gross's patient chart: "He is to return as neces-
sary."

Gross next presented himself at Dr. Fister's office 18 months later to have
the doctor examine a lesion on his nose. Although the condition was origi-
nally diagnosed as a slightly infected cyst and treated with medication, after
two biopsies were performed, it was identified as grade III squamous cell
carcinoma. On May 5, 1986, Dr. Fister's associate, Dr. Recabaren, per-
formed the radical surgery which is the subject of the underlying medical
malpractice action. Two additional nasal biopsies performed during the
subsequent eight-month period revealed no further malignancies.

In their opposition to appellants' motion, respondents sought to demon-
strate the arbitration agreement had been intended to cover only those
services rendered contemporaneous to its signing, i.e., the minor surgeries
performed on August 16 and 23, 1984. In support of their position, they
submitted the declaration of Steven Gross who averred in relevant part: "6.
The sutures [for the first two surgeries] were removed by September 1984
and I paid for these minor procedures soon thereafter. There were no plans
to return to Dr. Fister and our medical relationship ended at that time.

"`·` `·` `·` `·` `·` `·` `·` `·` `·` `·` `·` `·` `·` `·` `·` `·` `·`

"8. I did not see Dr. Fister again until over 18 months later, when I was diagnosed as having cancer and operated on by Dr. Recabarren [*sic*] on May 5, 1986.

"9. The cancer diagnosis and the cancer surgery on May 5, 1986, was in no way related to the removal of the mole and cyst from my scalp that Dr. Fister removed in August, 1984."

The trial court, persuaded by respondents' argument, issued a statement of decision which concluded: "The agreement signed by Steven Gross is not applicable to his claims as stated in the Complaint because those conditions are severable from those conditions for which the Agreement was signed and due to the length of time between the signing of the agreement and the claimed malpractice. During that period of time the Doctor/Patient relationship had ended and any Open Book Account between the parties had been closed. The agreement in question was signed only for minor surgical procedures and the alleged malpractice was not a variation of nor a follow-up procedure."

This state has a strong public policy favoring arbitration over litigation as a speedy and relatively inexpensive means of dispute resolution which eases court congestion. (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc.* v. *100 Oak Street* (1983) 35 Cal.3d 312, 322 [197 Cal.Rptr. 581, 673 P.2d 251]; *Madden* v. *Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 706-707 [131 Cal.Rptr. 882, 552 P.2d 1178]; *Hilleary* v. *Garvin* (1987) 193 Cal.App.3d 322, 325 [238 Cal.Rptr. 247].) This mechanism took on added significance during the 1970's with the advent of the so-called "medical malpractice crisis."

On May 19, 1975, the Governor convened an extraordinary session of the Legislature (Governor's Proclamation to Leg. (May 16, 1975) 10 Sen. J. (1975-1976 Second Ex. Sess.) pp. 2-3), "to deal exclusively with the formulation of a legislative solution to the 'crisis.' " (7 Pacific L.J. 545 (1976).) Among the items the Governor requested the Legislature consider was ". . . Voluntary binding arbitration in order to quickly and fairly resolve malpractice claims while maintaining fair access to the courts." (Governor's Proclamation to Leg. (May 16, 1975) 10 Sen. J. (1975-1976 Second Ex. Sess.) p. 2.)

During this session the Legislature passed and the Governor approved the Medical Injury Compensation Reform Act (MICRA) (Stats. 1975, Second Ex. Sess. 1975-1976, chs. 1-2, pp. 3949-4007) of which Code of Civil

Procedure section 1295 is a part. Section 1295 "encourages and facilitates the *arbitration* of medical malpractice disputes by specifying uniform language to be used in binding arbitration contracts to assure that the patient knows what he is signing and what its ramifications are."[1] (Keene, California's Medical Malpractice Crisis, A Legislator's Guide to the Medical Malpractice Issue, at p. 31, italics in original.)

The agreement in the instant case was drafted pursuant to section 1295 and no claim is made that it is in any manner deficient. Article I of the

[1] Section 1295 provides: "(a) Any contract for medical services which contains a provision for arbitration of any dispute as to professional negligence of a health care provider shall have such provision as the first article of the contract and shall be expressed in the following language: 'It is understood that any dispute as to medical malpractice, that is as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently or incompetently rendered, will be determined by submission to arbitration as provided by California law, and not by a lawsuit or resort to court process except as California law provides for judicial review of arbitration proceedings. Both parties to this contract, by entering into it, are giving up their constitutional right to have any such dispute decided in a court of law before a jury, and instead are accepting the use of arbitration.'

"(b) Immediately before the signature line provided for the individual contracting for the medical services must appear the following in at least 10-point bold red type: [¶] 'NOTICE: BY SIGNING THIS CONTRACT YOU ARE AGREEING TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE DECIDED BY NEUTRAL ARBITRATION AND YOU ARE GIVING UP YOUR RIGHT TO A JURY OR COURT TRIAL. SEE ARTICLE 1 OF THIS CONTRACT.'

"(c) Once signed, such a contract governs all subsequent open-book account transactions for medical services for which the contract was signed until or unless rescinded by written notice within 30 days of signature. Written notice of such rescission may be given by a guardian or conservator of the patient if the patient is incapacitated or a minor.

"(d) Where the contract is one for medical services to a minor, it shall not be subject to disaffirmance if signed by the minor's parent or legal guardian.

"(e) Such a contract is not a contract of adhesion, nor unconscionable nor otherwise improper, where it complies with subdivisions (a), (b) and (c) of this section.

"(f) Subdivisions (a), (b), and (c) shall not apply to any health care service plan contract offered by an organization registered pursuant to Article 2.5 (commencing with Section 12530) of Division 3 of Title 2 of the Government Code, or licensed pursuant to Chapter 2.2 (commencing with Section 1340) of Division 2 of the Health and Safety Code, which contains an arbitration agreement if the plan complies with paragraph (10) of subdivision (a) of Section 1363 of the Health and Safety Code, or otherwise has a procedure for notifying prospective subscribers of the fact that the plan has an arbitration provision, and the plan contracts conform to subdivision (h) of Section 1373 of the Health and Safety Code.

"(g) For the purposes of this section: [¶] (1) 'Health care provider' means any person licensed or certified pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code, or licensed pursuant to the Osteopathic Initiative Act, or the Chiropractic Initiative Act, or licensed pursuant to Chapter 2.5 (commencing with Section 1440) of Division 2 of the Health and Safety Code; and any clinic, health dispensary, or health facility, licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code. 'Health care provider' includes the legal representatives of a health care provider;

"(2) 'Professional negligence' means a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital."

document sets forth the mandatory language required by subdivision (a) and article III additionally warns of the agreement's applicability to "any claim in tort, contract or otherwise." The admonition required by subdivision (b) immediately precedes the signature lines. Nonetheless, as typically occurs (*Hilleary* v. *Garvin, supra,* 193 Cal.App.3d at p. 326), the agreement did not expressly delineate the scope of the services contracted for, other than to state "H. William Fister, M.D., Inc. agrees to provide to the undersigned patient medical, surgical and related health care services in consideration for the payment on a fee for service basis."[2]

■ Because the scope of arbitration is a matter of agreement between the parties, " '[t]he court should attempt to give effect to [their] intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made [citation].' [Citation.]" (*Victoria* v. *Superior Court* (1985) 40 Cal.3d 734, 744 [222 Cal.Rptr. 1, 710 P.2d 833].) Any doubts concerning the scope of arbitrable issues must be resolved in favor of arbitration. (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc.* v. *100 Oak Street, supra,* 35 Cal.3d at p. 323.)

It is manifest that the contract signed by Steven Gross cannot, on its face, reasonably be said to be limited only to those services provided contemporaneous to its signing. While we need not here attempt to define its full reach, we are satisfied that, at the very least, it was intended to encompass those situations where Gross, in the course of an ongoing doctor-patient relationship, sought treatment for a condition of the type which initially brought him to Dr. Fister's office. As we stressed in *Hilleary* v. *Garvin, supra,* 193 Cal.App.3d at page 326, "To impose upon a physician, during a continuous doctor-patient relationship, the extra burden of having to renew the arbitration agreement each time there is a variation in treatment or ailment would be impractical, and would frustrate the purpose of the statute, which is to facilitate, not emasculate, the arbitration process."

Although the course of treatment Gross received in 1984 and 1986 differed, in each instance he sought medical services for the treatment of similar problems, i.e., potentially malignant skin lesions on his face and head. Fortunately, the mole and cyst for which he initially sought aid were benign, necessitating only minor surgery. The nasal cyst, on the other hand, was malignant and a more radical approach was undertaken.

■ Apart from Steven Gross's statements concerning his uncommunicated subjective intent, which were, of course, irrelevant (*Hilleary* v. *Garvin,*

---

[2] The contract indicates the partner, agents, designated alternate, employees and successors in interest of Dr. Fister's professional corporation are also subject to the arbitration clause.

*supra,* 193 Cal.App.3d at p. 327), there was simply no objective evidence from which a reasonable person could conclude either of the parties viewed their relationship as having terminated in 1984. The mere fact that they did not anticipate Gross would return in the absence of further dermatological problems requiring the attention of an oncologist does not demonstrate otherwise. Obviously, Gross *hoped* additional treatment would not be necessary. When it was, however, he once again sought Dr. Fister's services. This was persuasive evidence of an ongoing relationship. Likewise, the manner in which Steven Gross's medical and billing records were maintained by Dr. Fister was indicative of a continuing association.

Code of Civil Procedure section 1295, subdivision (c) expressly provides that "Once signed, such a contract governs all subsequent open-book account transactions for medical services for which the contract was signed until or unless rescinded by written notice within 30 days of signature" and the evidence here conclusively established that medical services were rendered to Steven Gross pursuant to a "book account" as defined by section 337a. Respondents cannot, and do not, contend otherwise, but urge only that the account was "closed" in 1984 when all bills for the treatment Steven Gross had received that year were paid, leaving the account with a zero balance.

■ While an "open" book account has been defined as " '[a]n account with one or more items unsettled,' " it also includes " 'an account with dealings still continuing.' " (*Mercantile Trust Co.* v. *Doe* (1914) 26 Cal.App. 246, 253 [146 P. 692].) By contrast, a "closed" account is, according to Black's Law Dictionary, one "to which no further additions can be made on either side . . . ." Thus, it is clear that the "open" or "closed" nature of a book account turns not on the account balance per se, but on the parties' expectations of possible future transactions between them. ■ Since, as we have previously determined, the parties' relationship here was ongoing at the time of Gross's surgery in 1986, that procedure must be deemed a "subsequent open-book account transaction[] for medical services for which the contract was signed . . . ." (Code Civ. Proc., § 1295, subd. (c).)

■ Because the trial court erroneously found the medical services giving rise to Steven Gross's malpractice charge were not subject to the arbitration agreement, it had no occasion to evaluate the document's potential applicability to the loss of consortium claim urged by Nancy Gross, who was not a signatory to the contract. In resolving this issue we are in the unhappy position of having to choose between the decisions of two of our colleagues, *Baker* v. *Birnbaum* (1988) 202 Cal.App.3d 288 [248 Cal.Rptr. 336], and *Herbert* v. *Superior Court* (1985) 169 Cal.App.3d 718 [215

Cal.Rptr. 477], appeals decided by this district's divisions four and five respectively. Though the cases are distinguishable on a number of points (see the concurring opinion of Justice George in *Baker, supra,* 202 Cal.App.3d at p. 294), their holdings appear to reflect an irreconcilable divergence of views extending beyond any factual differences.

In essence, the court in *Herbert* concluded that three adult children of the decedent, who were neither members of, nor signatories to, the family's group health plan "requiring arbitration of any claim asserted by a member or a member's heir or personal representative arising from the rendition or failure to render services under the agreement, irrespective of the legal theory upon which the claim is asserted" (*supra,* 169 Cal.App.3d at p. 720), were nonetheless subject to its arbitration clause.

The court opined in pertinent part, "it is obviously unrealistic to require the signatures of all the heirs, since they are not even identified until the time of death, or they might not be available when their signatures are required. Furthermore, if they refused to sign they should not be in a position possibly to delay medical treatment to the party in need. Although wrongful death is technically a separate statutory cause of action in the heirs, it is in a practical sense derivative of a cause of action in the deceased. Decedents are able to bind their heirs through wills and other testamentary dispositions so the concept is not new or illogical. Instead it is the only pragmatic solution in such a situation. . . ." (169 Cal.App.3d at p. 725. See also Note, *California Medical Malpractice Arbitration and Wrongful Death Actions* (1978) 51 So.Cal.L.Rev. 401, 418.)

Though the provisions of Code of Civil Procedure section 1295 were technically inapplicable to the health care service plan under review in *Herbert* "because such plans must contain alternative means of notifying plan members of arbitration provisions in the plan agreements" (*supra,* 169 Cal.App.3d at p. 727, fn. omitted), the court found them to be "supportive in form and logic" (*id.,* at p. 726), since they evidenced "a legislative intent that a patient who signs an arbitration agreement may bind his heirs to that agreement, regardless of whether the heirs are also members of the plan." (*Id.,* at p. 727.)

The court in *Baker,* decided three years later, explicitly declined to adopt such an approach. It acknowledged "[a] line of cases has held that, in some circumstances, a person who has authority to contract for medical services on behalf of another may, in the exercise of that authority, bind that person to an agreement to arbitrate his or her medical malpractice claims. [*Madden* v. *Kaiser Foundation Hospitals, supra,* 17 Cal.3d at p. 709 (agent or other fiduciary is authorized to enter into agreement providing for arbitra-

tion of beneficiary's claims for medical malpractice); *Doyle v. Giuliucci* (1965) 62 Cal.2d 606, 610 [43 Cal.Rptr. 697, 401 P.2d 1] (parent may bind child to arbitrate claims arising under contract for medical care of which child is a beneficiary); *Harris v. Superior Court* (1986) 188 Cal.App.3d 475, 479 [233 Cal.Rptr. 186] (health care provider's agreement to arbitrate is binding upon employee who was a nonsignatory beneficiary to the agreement); *Wilson v. Kaiser Foundation Hospitals* (1983) 141 Cal.App.3d 891, 898 [190 Cal.Rptr. 649] (parent may contract for unborn child's medical care and bind it to arbitration); *Hawkins v. Superior Court* (1979) 89 Cal.App.3d 413, 419 [152 Cal.Rptr. 491] (spouse is authorized to contract for health plan for self and wife and to agree that both will arbitrate medical malpractice claims).]" (*Baker, supra,* 202 Cal.App.3d at p. 291.)

Nonetheless, the court in *Baker* determined not to apply this rule to the situation before it, concluding a spouse who had "signed an agreement to arbitrate 'any dispute as to medical malpractice'" (*id.,* at p. 290) had not thereby bound her nonsignatory spouse when the services for which she had contracted were for herself only. (*Id.,* at p. 292.) In so holding, it relied exclusively upon its earlier decision in *Rhodes v. California Hospital Medical Center* (1978) 76 Cal.App.3d 606 [143 Cal.Rptr. 59], in which it had determined the husband and son of a deceased patient were not bound to arbitrate their wrongful death claim because neither had ever contracted to forego his rights to have his cause of action determined by a jury. (*Id.,* at p. 609.) *Rhodes,* in turn, had recognized the strong public policy favoring arbitration, but chose to rely upon the simple proposition that this "policy does not extend to those who are not parties to an arbitration agreement or who have not authorized anyone to act for them in executing such an agreement," since "[t]he right to arbitration depends on a contract. (Code Civ. Proc., § 1281.)" (*Id.,* at p. 609.)

After carefully considering each of the foregoing decisions, we are persuaded the reasoning articulated in *Herbert v. Superior Court, supra,* 169 Cal.App.3d 718, more appropriately treats with the practical realities of the situation and more accurately reflects existing case law governing the applicability of arbitration agreements to nonsignatories.

We, also, are unable to accede to the suggestion in *Baker v. Birnbaum, supra,* 202 Cal.App.3d at page 294, that an individual contract for medical services "should be more rigorously analyzed and less quickly applied to the claims of a nonsignatory" than a negotiated group health plan. ▪ Heightened scrutiny, of course, is appropriate in the case of contracts of adhesion (*Madden v. Kaiser Foundation Hospitals, supra,* 17 Cal.3d at p. 710, and cases cited therein), but when an arbitration agreement comports with the requirements of Code of Civil Procedure section 1295, it is,

by definition, "not a contract of adhesion, nor unconscionable nor otherwise improper . . . ." (§ 1295, subd. (e).)

■ The construction of section 1295 proposed in *Herbert* v. *Superior Court, supra,* 169 Cal.App.3d 718, is not only consistent with the language of the statute, but appears to us essential to further the goals of the legislation and the judicially declared preference in favor of joining loss of consortium and negligence claims (*Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 407 [115 Cal.Rptr. 765, 525 P.2d 669], including fn. 29 at pp. 407-408); safeguard the physician-patient relationship; and preserve important privacy rights of the patient. We therefore hold that where, as here, a patient expressly contracts to submit to arbitration "any dispute as to medical malpractice," and that agreement fully complies with Code of Civil Procedure section 1295, it must be deemed to apply to *all* medical malpractice claims arising out of the services contracted for, regardless of whether they are asserted by the patient or a third party.

A loss of consortium claim is unquestionably encompassed within this holding, for though it "is not merely derivative or collateral to the [patient-] spouse's cause of action (*Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382 []), it is based on the physical injury or disability of [that individual] . . . ." (*Cole* v. *Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 162-163 [233 Cal.Rptr. 308, 729 P.2d 743].)

Of course, the statute's general applicability to actions of this type does not resolve the question whether claimants who might otherwise be bound by an arbitration agreement will be excluded if they were not signatories to it. Although the statute is silent on this point, we believe logic precludes such an exclusion. It is true a physician may inquire into, and if honestly answered ascertain, a patient's marital status at the time of the initial visit, but relationships change. Consequently, to insure the inviolability of an arbitration agreement a doctor, at a minimum, would be required to reinterrogate the patient at every visit, and postpone further treatment if a recently acquired spouse is not present to join in the execution of a new agreement. We have previously rejected such a potential solution as unworkable and undesirable (*ante,* at p. 777) and one which would appear certain to have a deleterious effect on the physician-patient relationship.

Among the factors which have been identified as contributing to the growth in patients' suits against their doctors is the increasing depersonalization in their relationships. (Preliminary Rep., Assem. Com. on Medical Malpractice (June 1974) pp. 3-4, par. 5a.) This unfortunate trend could only be exacerbated by injecting the specter of litigation, even indirectly, into each contact between doctor and patient. As appellants quite correctly

pointed out during oral argument, one of the benefits of an ongoing relationship is not having to sign forms each time a patient visits the doctor.

In addition, were patients to be less than candid concerning their marital status, should their duplicity be permitted to involuntarily expose to the expense and trauma inherent in a civil suit those whom they ask to minister to their medical needs? On the other hand, were we to protect the physician from such deception, would we not be allowing mendacity to achieve that which integrity could not, i.e., the binding of a nonsignatory to an arbitration agreement?

Finally, and in our view the most significant consideration, to authorize an intrusion into a patient's confidential relationship with a physician as the price for guaranteeing a third person, even a spouse, access to a jury trial *on matters arising from the patient's own treatment,* poses problems of a particularly serious nature. One might hope that spouses will voluntarily communicate with each other regarding their respective medical treatment, whether it involves a routine matter or a most intimate and sensitive procedure such as a vasectomy or the termination of a pregnancy. Nonetheless, it would be impermissible to adopt a rule that would require them, or their physicians, to do so, or that would permit one spouse to exercise a type of veto power over the other's decisions. Yet construing section 1295 to require a spouse's concurrence in an arbitration agreement would, in certain situations at least, have exactly that effect.

The significance of a patient's personal privacy rights with respect to medical matters is accorded special protection by the Legislature. (Evid. Code, § 990 et seq. [Physician-Patient Privilege], Civ. Code, § 56 et seq. [Confidentiality of Medical Information Act].)

In addition, the California voters in 1972 amended article I, section 1 of our state Constitution to include among the various "inalienable rights" that of "pursuing and obtaining . . . privacy." ■ The "zones of privacy" created by this amendment "extend to the details of one's medical history" (*Cutter* v. *Brownbridge* (1986) 183 Cal.App.3d 836, 842 [228 Cal.Rptr. 545]), "'. . . an area of privacy infinitely more intimate, more personal in quality and nature than many areas already judicially recognized . . . .'" (*Jones* v. *Superior Court* (1981) 119 Cal.App.3d 534, 549 [174 Cal.Rptr. 148], quoting from *Board of Medical Quality Assurance* v. *Gherardini* (1979) 93 Cal.App.3d 669, 678 [156 Cal.Rptr. 55].) In the event reproductive health care decisions are involved, the federal Constitution is implicated as well. (See, e.g., *Planned Parenthood of Missouri* v. *Danforth* (1976) 428 U.S. 52 [49 L.Ed.2d 788, 96 S.Ct. 2831] [state does not have

constitutional authority to give spouse the ability to prohibit wife from terminating her pregnancy].)

Although the amendment to article I, section 1 of our Constitution "does not purport to prohibit all incursion into individual privacy[,] . . . any such intervention must be justified by a compelling interest" (*White* v. *Davis* (1975) 13 Cal.3d 757, 775 [120 Cal.Rptr. 94, 533 P.2d 222]) "and any statute authorizing invasion of such area of privacy must be subject to strict scrutiny." (*Board of Medical Quality Assurance* v. *Gherardini, supra,* 93 Cal.App.3d at p. 679.) It would appear indisputable that if spouses disagree on any decision regarding the terms of medical treatment, including the desirability of an arbitration provision, the view of only one can prevail. Inasmuch as the patient is more directly and immediately affected, as between the two, the balance must weigh in that individual's favor.

The order under review is reversed and the cause remanded so the trial court may enter a new order granting appellants' motion for an order compelling arbitration as to both respondents. Appellants shall receive their costs on appeal.

Roth, P. J., and Fukuto, J., concurred.