[Nos. A045736, A046320. First Dist., Div. One. June 27, 1991.]

R.N.C., INC., Plaintiff and Appellant, v.
GEORGE H. TSEGELETOS et al., Defendants and Respondents.

[No. A047286. First Dist., Div. One. June 27, 1991.]

ROSSIGNOL SKI COMPANY, INC., Plaintiff and Appellant, v.
GEORGE H. TSEGELETOS et al., Defendants and Respondents.

**COUNSEL**

David B. Bloom for Plaintiffs and Appellants.

Sedgwick, Detert, Moran & Arnold, W. Bruce Wold, Frederick D. Baker, McNeil & Silveira and Daniel A. Gamer for Defendants and Respondents.

**OPINION**

STEIN, J.—On October 18, 1985, R.N.C., Inc., (RNC) filed a complaint against George and Charlotte Tsegeletos and Warren and Edith DeGraff. (Super. Ct. No. 125382.) The complaint alleged, in essence, that the Tsegeletos and DeGraffs had guaranteed the debts of Skip Sports Group, Inc., that Skip Sports had failed to pay its debts to RNC, and that the Tsegeletos and DeGraffs therefore were liable to RNC under the guarantee agreement. Also on October 18, 1985, RNC, under the name Rossignol Ski Co., Inc., filed a similar complaint against George H. Tsegeletos, Alfred J. Villa and

P. Roy Vallarino (Super. Ct. No. 125379)[1] The court subsequently issued three orders for summary judgment: one in favor of the Tsegeletos; one in favor of the DeGraffs; and one in favor of George Tsegeletos and Alfred Villa. All three orders were entered on the grounds that RNC had failed to file its complaint within the time limit of the applicable statute of limitations. Judgment was entered upon each order, and RNC has filed an appeal from each judgment. The appeals have been consolidated and all three will be considered here.

## FACTS

RNC periodically shipped goods to Skip Sports. Each shipment was accompanied by an invoice specifying the amount due on such goods and the date at which that amount became due. There is no contention but that the various defendants (hereafter referred to as the guarantors) guaranteed payment for these goods. As relevant here, RNC sought payment for goods shipped under invoices 032040 and 032041, payments for which were due on September 10, 1980; and goods shipped under invoices 034296 and 037424, payments for which were due on December 10, 1980. Skip Sports did not make those payments. RNC continued to demand that the payments be made, along with resulting charges for late payment. RNC wrote to Skip Sports on December 30, 1980, about some checks that had been returned and summarizing the credits and debits as of that time. On March 4, 1981, RNC wrote:

"This is our final request for the payment of your account in the amount of $37039.70.

"Unless we receive your remittance in settlement by 3/20/81, we shall be obliged to hand your account over to the Intercontinental Financial Services for collection."

George H. Tsegeletos, as the president of Skip Sports, wrote on October 5, 1981:

"Per our conversation on Friday, I have enclosed the post dated checks as we discussed. Along with them is a smaller check for immediate payment towards the account. I'll call you around the 15th of November to touch bases.

"Once again we thank you for your help and patience."

---

[1] The proceedings were stayed as to Vallarino, who was under the jurisdiction of the United States Bankruptcy Court, and Vallarino is not a party to these appeals.

Skip Sports sent RNC a cashier's check for $1,000, dated February 17, 1982, and a check dated February 15, 1982, for $4,085.94, which check was in fact cashed by RNC. Skip Sports further sent RNC several other checks dated February 15 and February 26, 1982, which were returned for insufficient funds.

■ In summary, the evidence discloses that Skip Sports maintained an open account with RNC, that the charges for the last item shipped were due and owing on that account in December 1980, that RNC demanded payment in full of that account in December 1980 and again in March 1981 and that Skip Sports made a partial payment towards the account as late as February 1982.

The actions at issue arose out of the failure of Skip Sports to pay its account with RNC. Any action against Skip Sports, therefore, was governed by Code of Civil Procedure section 337, providing that such action must be brought within four years. ■ It is settled that "the liability of a surety (in the absence of a different contractual provision) accrues at the same time as that of the principal, or upon default of the principal." (*Bloom* v. *Bender* (1957) 48 Cal.2d 793, 799 [313 P.2d 568].)[2] It is further settled that "a payment by a principal debtor will not operate to toll the statute of limitations as to a guarantor." (*Purdy* v. *Maree* (1939) 31 Cal.App.2d 125, 127 [87 P.2d 390].)

■ The instant controversy arises from the different interpretations given by the parties to the relationship between RNC and Skip Sports after December 1980. The guarantors argue that Skip Sports defaulted on its debt no later than December 1980. From this it follows that the cause of action accrued against Skip Sports, and the guarantors, as of December 1980, and that the later payments by Skip Sports could have done no more than toll the statute of limitations as to the principal debtor. It follows that RNC was required to file its action against the guarantors no later than December 1984.

Appellant, however, points out that Skip Sports's debt arose from a "book account," a form of open account.[3] ■ It has been held that the

---

[2] The contracts at issue did not specifically provide that the guarantors were "sureties." The distinction between guarantor and surety, however, has been abolished. (Civ. Code, § 2787.)

[3] Code of Civil Procedure section 337a defines "book account" as "a detailed statement which constitutes the principal record of one or more transactions between a debtor and a creditor arising out of a contract or some fiduciary relation, and shows the debits and credits in connection therewith, and against whom and in favor of whom entries are made, is entered in the regular course of business as conducted by such creditor or fiduciary, and is kept in a reasonably permanent form and manner and is (1) in a bound book, or (2) on a sheet or sheets

four-year period of limitations on a book account begins as of the last entry in the book account. (*Davidson* v. *Tilden* (1978) 86 Cal.App.3d 283, 287 [150 Cal.Rptr. 194]; *Furlow P. B. Co.* v. *Balboa L. & W. Co.* (1921) 186 Cal. 754, 763 [200 P. 625].) RNC takes the position that the February 1982 payment by Skip Sports towards its account was an entry on the book account and thus the four-year limitation period against Skip Sports (and thus also against the defendants/guarantors) commenced as of February 1982. Under RNC's analysis, its complaint filed in October 1985 was within the limitation period.

A book account does not remain open indefinitely so that any payment towards the debt necessarily becomes an "entry" for purposes of the applicable limitations period. Instead, a book account like any open account becomes closed once the account creditor ceases to extend credit and there will be no further activity on the account other than the payments by a creditor towards the settled debt. ■ "While an 'open' book account has been defined as ' "[a]n account with one or more items unsettled," ' it also includes '"an account with dealings still continuing." ' (*Mercantile Trust Co.* v. *Doe* (1914) 26 Cal.App. 246, 253 [146 P. 692].) By contrast, a 'closed' account is, according to Black's Law Dictionary, one 'to which no further additions can be made on either side . . . .' Thus, it is clear that the 'open' or 'closed' nature of a book account turns not on the account balance per se, but on the parties' expectations of possible future transactions between them [on that account]." (*Gross* v. *Recabaren* (1988) 206 Cal.App.3d 771, 778 [253 Cal.Rptr. 820].)

■ As summarized in 1 Am.Jur.2d, Accounts and Accounting, section 4, pages 373-374, footnotes omitted: "An open account results where the parties intend that the individual items of the account shall not be considered independently, but as a connected series of transactions, and that the account shall be kept open and subject to a shifting balance as additional related entries of debits and credits are made, until it shall suit the convenience of either party to settle and close the account, and where, pursuant to the original express or implied intention, there is but one single and indivisible liability arising from such series of related and reciprocal debits and credits. This single liability is to be fixed on the one part or the other, as the balance shall indicate at the time of settlement, or following the last pertinent entry of the account, and it must be one mutually agreed upon between the parties or impliedly imposed upon them by law."

---

fastened in a book or to backing but detachable therefrom, or (3) on a card or cards of a permanent character, or is kept in any other reasonably permanent form and manner." The defendants do not contend that RNC and Skip Sports maintained anything other than a book account.

In the present case "the last pertinent entry" was the December 1980 entry showing a balance then due. When Skip Sports failed to pay that amount, it defaulted on the account. When no further credit was extended, the "open" character of the account ended. What had been an open account was settled when RNC demanded payment of the full amount then owed; i.e., in December 1980—or at most no later than March 1981 when RNC threatened to turn the debt over to a collection agency. Any payments made by Skip Sports on the settled account were nothing more than partial payments towards a fixed debt and, absent any indication that RNC intended to extend additional credit to Skip Sports on the same account, did not operate to reopen it.

The cases cited by RNC compel no other conclusion. In *Egan* v. *Bishop* (1935) 8 Cal.App.2d 119 [47 P.2d 500], involving charges for legal services rendered, the court did no more than reject the argument that a creditor on an open account could bring suit only on such charges as had been entered within the four years preceding the suit. In *Gardner* v. *Rutherford* (1943) 57 Cal.App.2d 874 [136 P.2d 48], a creditor advanced loans to the corporation over a period of time. As of January 1, 1931, the account had an outstanding balance of $2,535.51. No payments against it were made for over four years. The balance, however, was carried on the books and entered on a ledger sheet on January 1, 1936. Payments against it were made in February 1936 and the creditor advanced additional amounts in February 1936 and May 1938. The corporation made payments on the account from March 1936 to March 1939. The court was primarily concerned with the lapse in activity between 1931 and 1936 and in essence found that so long as the account in fact remained "open" during that period of time, the statute of limitations did not begin to run. The evidence demonstrated that the account did in fact remain open because additional credits and debits were added to it until 1939. While it is true that the court found that the "last item" for purposes of the statute of limitations was the final payment made on the account, that finding in context means nothing more than that under the facts of that case the account ceased being active as of the date of the last payment; i.e., that only at that point was the final debt "fixed" and the account closed, and did the period of limitations begin to run.

In *Furlow P. B. Co.* v. *Balboa L. & W. Co.*, *supra*, 186 Cal. 754, the plaintiff shipped carloads of brick to the defendant over a period of time ending April 19, 1913. These shipments were duly entered in an account-book. The defendant made payments against the account in June 1913. Other payments were made in August 1913 and August 1914. By this time, however, a controversy had arisen. The defendants believed themselves to have been shorted one carload of brick and were reluctant to pay for something they believed they had not received. The parties communicated

about the account and the missing brick at least until December 1914. The complaint was filed on May 15, 1918, within four years of the last payment, but more than four years after the last shipment. The transaction therefore appears to have been one in which the parties contemplated that the defendant would be permitted to pay the debt over a period of time, and thus the defendant defaulted only after it ceased its periodic payments (as contrasted with the situation in the present case where the full amount was demanded in December 1980). The court, analogizing the situation before it to that of an "open, mutual and current account," found: "The rule has long been settled in this state with reference to 'a mutual, open and current account' . . . that the statute runs from the date of the last item shown in the account [citation] . . . . If we apply the rule so well established as to 'a mutual, open and current account,' it would follow that the four-year period of limitations runs from the date of the last payment, in this case August 13, 1914." (*Id.* at p. 763.)[4] The case does not stand for the proposition that the limitations period always begins at the date of the last payment. Rather, the court found no more than that under the facts before it the relevant date happened to be the partial payment on August 14, 1914, which payment was due, but not past due on the account. By failing to pay the full amount on that date the debtor defaulted, and it was the fact of the default, rather than of the payment, which triggered the applicable limitations period.

Our conclusion is supported by the case of *Carter* v. *Canty* (1919) 181 Cal. 749 [186 P. 346], cited by the *Furlow* court as authority for the proposition that the relevant date for purposes of the statute of limitations is the date of the last item shown in the account. In *Carter*, as in many of the

---

[4]The court went on to make a finding which does not appear accurately to reflect the law, but which has no particular impact on the result of the present case. Thus, the court held, "In most of the states a partial payment upon an account *tolls the statute*. The rule is otherwise in this state, because of section 360 of the Code of Civil Procedure requiring a written acknowledgment, but it is a reasonable construction of the legislation fixing a different period of limitation upon an 'open book account' from an ordinary account to hold that the payment made and entered upon the open book account tolls the statute. It follows that the statute of limitations began to run on this account on August 13, 1914, and that the amended complaint filed May 15, 1918, was within the four years." (*Id.* at p. 763, italics added.) The use of the word "toll" was perhaps inartful because, by the relationship of the parties, the statute of limitations did not begin to run until August 13, 1914, not because it was "tolled," but because by the apparent understanding between the parties, the default did not occur until that date. The court evidently was attempting to explain that, unlike the usual debt which is fully due and owing as of the date it is created, an open book account may contemplate that the date of potential default will be deferred. If we were to take the court's mention of tolling at face value, however, it would follow that the limitations period ordinarily would begin as of the date of the last debit, but was tolled by a subsequent partial payment. It has already been established that "a payment by a principal debtor will not operate to toll the statute of limitations as to a guarantor." (*Purdy* v. *Maree, supra,* 31 Cal.App.2d 127.) Thus, taking the discussion in *Furlow* at face value, the statute of limitations would have begun to run against the guarantors here as of the date of the last debit, again in December 1980.

cases already discussed, one issue was whether the limitations period as to debts incurred as part of an open account began to run as of the date of each individual debt, or if they had to be considered together as part of one transaction so that the limitations period was measured from the end of the transaction as a whole. The court—as did the courts in the other cases we have discussed—found that the latter analysis was correct. (181 Cal. at p. 755.) Far from holding that the relevant date was the date of entry of the last item, however, the court found that on the facts before it the relevant date was the date of the creditor's death (*ibid.*); an event which necessarily cleared the account. It follows that the relevant date is the date the debt becomes settled; i.e., the date the relationship between the parties has come to an end other than for purposes of paying amounts due or past due. In *Carter* that date was the date of the creditor's death. In *Furlow* that date was the date when the debtor declined to pay the full amount as it became due. In the present case the full amount was fixed, due and past due long before the February 1982 partial payments. The relevant date is December 10, 1980, when the debt became due and was not paid. Even if it were assumed that the parties contemplated a continuing relationship such that Skip Sports could have obtained additional credit on its account notwithstanding that it failed to make the December payment as it became due, the limitations period began to run no later than December 30, 1980, when RNC summed up the debt, or March 1981, when RNC demanded payment in full. Under all possibilities, the partial payment in 1982 could do no more than toll the limitations period as to the principal, but as to the guarantors, the limitations period ran before the complaint was filed.

Respondents are awarded attorney fees on appeal in an amount to be determined by the trial court.

The judgment is affirmed.

Newsom, Acting P. J., and Dossee, J., concurred.