[No. D022890. Fourth Dist., Div. One. Feb. 2, 1996.]

RICHARD COCHRAN et al., Plaintiffs and Respondents, v.
LAWRENCE RUBENS, Defendant and Appellant.

**COUNSEL**

Ault, Deuprey, Jones & Gorman, Mark T. Dea, Schmid, Norek & Voiles, Mitchell W. Roth and K. Elizabeth Cronin for Defendant and Appellant.

Lorens & Abrams and Alan A. Abrams for Plaintiffs and Respondents.

**OPINION**

**KREMER, P. J.**—Plaintiffs Richard Cochran (Cochran) and his wife Illa May Cochran filed a complaint against defendant Lawrence Rubens and others seeking recovery of damages for Cochran's personal injury and his wife's loss of consortium allegedly suffered as a result of defendants' professional negligence. Rubens appeals from the court's order denying his petition to stay the action and compel arbitration of plaintiffs' claims against him.[1] Rubens contends that pursuant to Code of Civil Procedure[2] section 1295, subdivision (c), the arbitration agreement Cochran signed when he saw Rubens in 1990 governs the treatment Rubens provided him in 1993

---

[1]Code of Civil Procedure section 1294 provides that "[a]n aggrieved party may appeal from: [¶] (a) An order dismissing or denying a petition to compel arbitration."

[2]All statutory references are to the Code of Civil Procedure.

(resulting in the instant litigation) because Rubens maintained an open book account for Cochran between his 1990 and 1993 visits. We conclude there is substantial evidence to support the court's implied finding that Cochran's book account closed after his 1990 visit. Accordingly, we affirm the order denying Rubens's petition to compel arbitration.

### FACTUAL AND PROCEDURAL BACKGROUND

In July 1990, Cochran's family physician referred Cochran to Rubens, an orthopedic specialist, for a consultation and evaluation concerning pain in his left ankle, which Cochran had fractured in 1974 or 1975. Rubens saw Cochran on July 27, 1990. Prior to being examined, Cochran signed an arbitration agreement. Rubens diagnosed Cochran as suffering from post-traumatic degenerative joint disease and gave him an injection of cortisone, an anti-inflammatory steroid. Rubens also discussed the possibility of surgery in the event the steroid injection failed to improve Cochran's symptoms. Rubens's report stated Cochran would return in two weeks for a progress evaluation.

Cochran felt the cortisone injection was not helpful and did not want to undergo surgery. He chose not to return to Rubens for the two-week follow-up visit, and had no further contact with Rubens until April of 1993. Cochran's insurance paid a portion of Rubens's fees for Cochran's July 1990 evaluation and treatment, and Cochran paid the remaining charges in 1990.

In March 1993, Cochran's family physician referred Cochran to Rubens for another evaluation of Cochran's left ankle. Rubens saw Cochran on April 12, 1993 and performed the previously recommended surgery on April 20, 1993.

Cochran and his wife filed the instant action in June 1994, alleging negligence during Cochran's ankle surgery on the part of Rubens and the other defendants resulted in damage to Cochran's vision and central nervous system. After answering the complaint, Rubens filed a petition to compel arbitration based on the July 1990 arbitration agreement. The court issued a telephonic ruling granting the petition, but reversed the telephonic ruling after hearing oral argument. The court ultimately found the 1990 arbitration agreement was not effective when Rubens performed the surgery in 1993.

### DISCUSSION

### I.  *Standard of Review*

Rubens contends his petition to compel arbitration is subject to de novo review because it involves interpretation of a written instrument and,

further, because it involves the interpretation of a statutory scheme. We disagree.

The issue before the trial court was whether, pursuant to section 1295, subdivision (c), the 1990 arbitration agreement governed the medical services Rubens performed in 1993. Section 1295, subdivision (c) provides that an arbitration agreement which is part of a contract for medical services, "[o]nce signed, . . . governs all subsequent open-book account transactions for medical services for which the contract was signed until or unless rescinded by written notice within 30 days of signature." (§ 1295, subd. (c).) Thus, whether the arbitration agreement in the instant case governed Rubens's 1993 treatment of Cochran depends upon whether that treatment was an open book account transaction for medical services for which Cochran contracted in 1990. If Cochran's book account closed before he returned to Rubens for evaluation and treatment in 1993, the 1990 arbitration agreement did not govern the 1993 treatment.

Whether a book account exists between parties is a question of fact. (See *Parker* v. *Shell Oil Co.* (1946) 29 Cal.2d 503, 512 [175 P.2d 838]; *Maggio, Inc.* v. *Neal* (1987) 196 Cal.App.3d 745, 752 [241 Cal.Rptr. 883]; *H. Russell Taylor's Fire Prevention Service Inc.* v. *Coca Cola Bottling Corp.* (1979) 99 Cal.App.3d 711, 728 [160 Cal.Rptr. 411].) Further, whether a book account is open or closed is a question of fact. "While an 'open' book account has been defined as ' "[a]n account with one or more items unsettled," ' it also includes ' "an account with dealings still continuing." ' [Citation.] By contrast, a 'closed' account is, according to Black's Law Dictionary, one 'to which no further additions can be made on either side. . . .' Thus, it is clear that the 'open' or 'closed' nature of a book account turns not on the account balance per se, *but on the parties' expectations of possible future transactions between them*." (*Gross* v. *Recabaren* (1988) 206 Cal.App.3d 771, 778 [253 Cal.Rptr. 820], italics added.)

Whether parties expect possible future transactions between them is, of course, a question of fact. In the physician-patient context, whether there is expectation of possible future transactions naturally depends on whether there is a continuing physician-patient relationship. Rubens argues a specifically identifiable physician-patient relationship is not required under section 1295, subdivision (c) for an arbitration agreement to be enforceable, as the statute requires only the existence of an open book account. Although it is true section 1295 does not expressly refer to a physician-patient relationship, the existence or nonexistence of such relationship is clearly relevant to the factual determination of whether a book account is "open" because the parties expect possible future transactions.

"Where the ruling that is the subject of appeal turns on the trial court's determination of disputed facts, the appropriate standard of review on appeal is 'sufficiency of the evidence.' Evidence is sufficient if there is 'substantial' evidence to support the ruling. Such evidence 'must be reasonable in nature, credible, and of solid value. . . .' [Citation.]" (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1065 [24 Cal.Rptr.2d 654].) It is an oft-repeated rule that an order challenged on appeal "is presumed correct and all intendments and presumptions are indulged to support the order on matters to which the record is silent. It is appellant's burden to affirmatively demonstrate error and, where the evidence is in conflict, [the appellate] court will not disturb the trial court's findings. [Citations.]" (*Laguna Auto Body* v. *Farmers Ins. Exchange* (1991) 231 Cal.App.3d 481, 487 [282 Cal.Rptr. 530].)

Since the outcome of Rubens's petition to compel arbitration turned on whether Cochran's book account closed before he returned to Rubens for treatment in 1993, the issue on appeal is whether there is substantial evidence to support the court's finding on that question of fact.

## II. *The Court's Findings*

The court explained in its decision that the 1990 arbitration agreement was no longer effective in 1993 as follows: "I somehow think these [arbitration] agreements should be biodegradable somehow and they will dispose of themselves after some period of time. I think after three years, on one referral on one injection[, that the 1993 treatment] shouldn't fall under the arbitration agreement." The court further explained, "You have a treating doctor that is treating [Cochran] throughout . . . . He makes one referral in 1990 and another referral in 1993. There's no connection between [Rubens and Cochran] in the meantime. There [were] no visits, no contact, and he is essentially a new patient in 1993. And I don't think any person can reasonably expect that a contract to arbitrate any disputes that were . . . made three years before could reasonably be believed to be recalled and resurrected when someone goes back . . . three years later."

Although it did not explicitly state so, the court in so many words found that between Cochran's single office visit to Rubens in 1990 and the second referral in 1993 there was no continuing physician-patient relationship between the parties and, therefore, no expectation of future medical transactions between them. This finding is sufficiently supported by the evidence. It is reasonable to infer from the fact Cochran chose not to return to Rubens for a recommended two week follow-up appointment after his first visit that Cochran had no expectation of future transactions with Rubens for medical

services. The lack of such expectation on the part of both parties is evidenced by the fact they had no contact with each other between Cochran's 1990 and 1993 visits. The absence of an ongoing physician-patient relationship between Cochran and Rubens is further evidenced by the fact Cochran had such a relationship with his family physician and only saw Rubens when his family physician referred him to Rubens, as the trial court emphasized.

Implicit in the court's finding there was no continuing physician-patient relationship and, therefore, no expectation of future medical transactions, is the finding the book account established in 1990 between the parties was no longer open at the time of the second referral in 1993. Rubens relies heavily on *Gross* v. *Recabaren, supra,* 206 Cal.App.3d 771, as support for his contention to the contrary.

In *Gross,* defendant Fister removed a mole and cyst from plaintiff Gross's scalp, and 18 months later performed surgery to remove a cancerous lesion from Gross's nose. Gross did not see Fister during the period between the two treatments. After Gross filed a malpractice lawsuit based on the nasal surgery, Fister petitioned to compel arbitration based on an arbitration agreement Gross had signed prior to the initial treatment. (206 Cal.App.3d at p. 774.)

The *Gross* court reversed the lower court's order denying the petition to compel arbitration, concluding the arbitration agreement "was intended to encompass those situations where Gross, *in the course of an ongoing doctor-patient relationship,* sought treatment for a condition of the type which initially brought him to Fister's office." (*Gross* v. *Recabaren, supra,* 206 Cal.App.3d at p. 777, italics added.) The court found ". . . there was simply no objective evidence from which a reasonable person could conclude either of the parties viewed their relationship as having terminated in 1984. The mere fact that they did not anticipate Gross would return in the absence of further dermatological problems requiring the attention of an oncologist does not demonstrate otherwise. Obviously, Gross *hoped* additional treatment would not be necessary. When it was, however, he once again sought Fister's services. This was persuasive evidence of an ongoing relationship. Likewise, the manner in which Steven Gross's medical and billing records were maintained by Fister was indicative of a continuing association." (*Id.* at p. 778.)

The *Gross* court focused on whether there was an ongoing physician-patient relationship because the existence of such a relationship meant the parties expected possible future transactions between them, and therefore the later surgery was a " 'subsequent open-book account transaction[] for medical services for which the contract was signed . . . .' (Code Civ. Proc.,

§ 1295, subd. (c).)" (*Gross* v. *Recabaren, supra,* 206 Cal.App.3d at p. 778.) Accordingly, pursuant to section 1295, subdivision (c), the parties' arbitration agreement governed the later surgery giving rise to the litigation. (206 Cal.App.3d at p. 778.) The *Gross* court's statement that ". . . there was simply no objective evidence from which a reasonable person could conclude either of the parties viewed their relationship as having terminated in 1984[]" (*ibid.*), indicates the court applied a "sufficiency of the evidence" standard in reviewing the trial court's finding that there was no open book account between the parties when Gross underwent the surgery giving rise to the litigation.

The present case is distinguishable from *Gross.* As discussed above, there is sufficient objective evidence from which a reasonable person could conclude the parties here terminated their physician-patient relationship in 1990 without expectation of future transactions between them. Thus, the court's finding to that effect is supported by substantial evidence.

CONCLUSION

In denying Rubens's petition to compel arbitration, the court impliedly found there was no expectation of future transactions between the parties after Cochran's 1990 visit to Rubens and, therefore, there was no open book account between them when Cochran returned to Rubens for evaluation and treatment in 1993. The court's implied findings are supported by substantial evidence. Accordingly, pursuant to section 1295, subdivision (c), the court correctly decided the arbitration agreement Cochran signed in 1990 did not govern the 1993 treatment giving rise to the instant litigation.

DISPOSITION

The order denying Rubens's petition to compel arbitration is affirmed.

Huffman, J., and Haller, J., concured.