[No. S131664. Feb. 8, 2007.]

TERRY REIGELSPERGER et al., Plaintiffs and Respondents, v.
JAMES M. SILLER, Defendant and Appellant.

COUNSEL

Law Offices of Rick A. Cigel, Rick A. Cigel; Law Offices of Richard G. Reinjohn, Richard G. Reinjohn; and Michael J. Schroeder for Defendant and Appellant.

Zuetel & Torigian and Kenneth R. Zuetel, Jr., for Cigna Healthcare of California, Inc., as Amicus Curiae on behalf of Defendant and Appellant.

Horvitz & Levy, S. Thomas Todd and Bradley S. Pauley for California Medical Association, California Dental Association and California Hospital Association as Amici Curiae on behalf of Defendant and Appellant.

Rich, Fuidge, Morris & Iverson and Roland K. Iverson, Jr., for Plaintiffs and Respondents.

## OPINION

**CORRIGAN, J.**—We here consider whether an arbitration agreement, signed when a chiropractor first treated a patient, applies to a medical malpractice claim arising from treatment for a different condition two years later. We conclude that it does because the agreement states it "is intended to bind the patient and health care provider . . . who now *or in the future* treat[s] the patient . . . ." (Italics added.)

### I.  FACTS AND PROCEDURAL BACKGROUND

In August of 2000, plaintiff Terry Reigelsperger sought treatment from chiropractor James M. Siller for severe pain in his lower back. Reigelsperger felt much better after the treatment. Before leaving the office, he paid his bill and signed an arbitration agreement.

The parties disagree over whether they contemplated an ongoing doctor-patient relationship. Siller claims he told Reigelsperger to return for further treatment if his symptoms persisted or recurred. Reigelsperger claims "there was no expectation of further treatment. . . . no request, suggestion, or advisement that [he] would return or was expected to return." Reigelsperger's wife confirms "[t]here was no discussion concerning any further treatment."

Reigelsperger did not see Siller for two years. However, in September of 2002, he sought treatment for his cervical spine and shoulder. This latter treatment is the subject of Reigelsperger's suit.

Siller contends the arbitration agreement governs Reigelsperger's claim. Article 1 of the agreement required the parties to submit to arbitration "*any* dispute as to medical malpractice." (Italics added.) Article 2 provided that "[t]his agreement is intended to bind the patient and the health care provider . . . who now *or in the future* treat[s] the patient . . . ." (Italics added.)[1] Reigelsperger also signed an "informed consent" form that appeared on the reverse side of the arbitration agreement. One of its provisions reads: "I intend this consent form to cover the entire course of treatment for my present condition *and for any future condition(s)* for which I seek treatment." (Italics added.)

Siller sought to stay litigation and compel arbitration. The trial court denied his petition and the Court of Appeal affirmed. We reverse the judgment of the Court of Appeal.

## II. DISCUSSION

Reigelsperger contends the arbitration agreement is not enforceable because it does not comply with section 1295 of the Code of Civil Procedure.[2] The argument fails.

Section 1295 was enacted as part of the Medical Injury Compensation Reform Act of 1975 (MICRA). (Stats. 1975, 2d Ex. Sess. 1975–1976, ch. 1, § 26.6, pp. 3975–3976.) MICRA was a response to a perceived crisis regarding the availability of medical malpractice insurance. "The problem . . . arose when the insurance companies which issued virtually all of the medical malpractice insurance policies in California determined that the costs of affording such coverage were so high that they would no longer continue to provide such coverage as they had in the past. Some of the insurers withdrew from the medical malpractice field entirely, while others raised the premiums which they charged to doctors and hospitals to what were frequently referred to as 'skyrocketing' rates. As a consequence, many doctors decided either to stop providing medical care with respect to certain high risk procedures or

---

[1] As explained below (*post*, at p. 579), the language of article 1 is required by section 1295 of the Code of Civil Procedure. The language of article 2 is not.

[2] All further section references are to the Code of Civil Procedure unless otherwise designated.

treatment, to terminate their practice in this state altogether, or to 'go bare,' i.e., to practice without malpractice insurance. The result was that in parts of the state medical care was not fully available, and patients who were treated by uninsured doctors faced the prospect of obtaining only unenforceable judgments if they should suffer serious injury as a result of malpractice." (*American Bank & Trust Co. v. Community Hospital* (1984) 36 Cal.3d 359, 371 [204 Cal.Rptr. 671, 683 P.2d 670].)

The purpose of section 1295 is to encourage and facilitate arbitration of medical malpractice disputes. (*Pietrelli v. Peacock* (1993) 13 Cal.App.4th 943, 946 [16 Cal.Rptr.2d 688]; *Gross v. Recabaren* (1988) 206 Cal.App.3d 771, 776 [253 Cal.Rptr. 820] (*Gross*).) Accordingly, the provisions of section 1295 are to be construed liberally. (See *Preferred Risk Mutual Ins. Co. v. Reiswig* (1999) 21 Cal.4th 208, 215 [87 Cal.Rptr.2d 187, 980 P.2d 895].)

To ensure that a patient understands that he or she is giving up his right to have a malpractice claim tried in court, section 1295 requires uniform language for arbitration agreements in medical services contracts.[3] (*Gross, supra*, 206 Cal.App.3d at p. 776.) The arbitration agreement here contains the language of section 1295. Therefore, it governs "all subsequent open-book account transactions for medical services for which the contract was signed." (§ 1295, subd. (c).)[4]

---

[3] Section 1295 provides in pertinent part:

"(a) Any contract for medical services which contains a provision for arbitration of any dispute as to professional negligence of a health care provider shall have such provision as the first article of the contract and shall be expressed in the following language: 'It is understood that any dispute as to medical malpractice, that is as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently or incompetently rendered, will be determined by submission to arbitration as provided by California law, and not by a lawsuit or resort to court process except as California law provides for judicial review of arbitration proceedings. Both parties to this contract, by entering into it, are giving up their constitutional right to have any such dispute decided in a court of law before a jury, and instead are accepting the use of arbitration.'

(b) Immediately before the signature line provided for the individual contracting for the medical services must appear the following in at least 10-point bold red type: 'NOTICE: BY SIGNING THIS CONTRACT YOU ARE AGREEING TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE DECIDED BY NEUTRAL ARBITRATION AND YOU ARE GIVING UP YOUR RIGHT TO A JURY OR COURT TRIAL. SEE ARTICLE 1 OF THIS CONTRACT.' "

[4] Section 1295, subdivision (c) provides: "Once signed, such a contract governs all subsequent open-book account transactions for medical services for which the contract was signed until or unless rescinded by written notice within 30 days of signature. Written notice of such rescission may be given by a guardian or conservator of the patient if the patient is incapacitated or a minor."

The Court of Appeal held substantial evidence supported the finding that the second treatment was not a "subsequent open-book account transaction[]" within the meaning of section 1295, subdivision (c). Thus, article 1 of the agreement did not apply to compel arbitration.

■ The Court of Appeal also concluded article 2 of the agreement did not compel arbitration because it, too, only applied if the parties had an open-book account relationship.[5] This conclusion is wrong. The parties agreed in article 2 that the agreement was "intended to bind the patient and the health care provider . . . who now or in the future treat[s] the patient . . . ." This plain language applies to require arbitration.

■ Regardless of whether the parties had an open-book account relationship within the meaning of section 1295, subdivision (c), their obligation to arbitrate under article 2 of their agreement would stand on its own. This agreement contained the language section 1295 requires. Having satisfied the statute, the parties remained free to adopt a broader arbitration agreement. "[N]othing in the wording of [section 1295] states that medical malpractice arbitration agreements may not also include additional provisions. In fact the wording of subdivision (a) is indicative of this when it requires mandatory language to be set forth in the *'first article* of the contract.' The implication here is that other articles may be added depending upon the needs of the parties." (*Coon v. Nicola* (1993) 17 Cal.App.4th 1225, 1232 [21 Cal.Rptr.2d 846].)

■ Here, the parties added article 2: "This agreement is intended to bind the patient and the health care provider . . . who now *or in the future* treat[s] the patient . . . ." (Italics added.) To contradict this objective manifestation of the parties' intent to arbitrate, Reigelsperger asserts that he had not intended to return to Siller for treatment. However, his uncommunicated subjective intent is irrelevant. (*Gross, supra,* 206 Cal.App.4th at p. 777; *Hilleary v. Garvin* (1987) 193 Cal.App.3d 322, 327 [238 Cal.Rptr. 247].) As Witkin has pointed out, "mutual consent is gathered from the reasonable meaning of the words and acts of the parties, and not from their unexpressed intentions or understanding." (1 Witkin, Summary of Cal. Law (10th ed.

---

[5] A *book account* is a detailed statement of debit/credit transactions kept by a creditor in the regular course of business, and in a reasonably permanent manner. (§ 337a.) In one sense, an *open-book account* is an account with one or more items unsettled. However, even if an account is technically settled, the parties may still have an open-book account, if they anticipate possible future transactions between them. (*Cochran v. Rubens* (1996) 42 Cal.App.4th 481, 485 [49 Cal.Rptr.2d 672]; *Gross, supra,* 206 Cal.App.3d at p. 778; *Mercantile Trust Co. v. Doe* (1914) 26 Cal.App. 246, 253 [146 P. 692].)

2005) Contracts, § 116, p. 155.) Regardless of whether Reigelsperger had a present intention to return for treatment, he agreed that if he *did* decide to do so, the arbitration provision in article 2 would apply to a future dispute.

■ Alternatively, the Court of Appeal held that the phrase "now or in the future treat[s]" "cannot reasonably be construed to bind the parties in perpetuity . . . ." The answer to this objection is that, like other contracts, arbitration agreements that do not specify a term of duration are terminable at will after a reasonable time has elapsed. (*Consolidated Theatres, Inc. v. Theatrical Stage Employees Union* (1968) 69 Cal.2d 713, 727–728 [73 Cal.Rptr. 213, 447 P.2d 325]; *Zee Medical Distributor Assn. Inc. v. Zee Medical, Inc.* (2000) 80 Cal.App.4th 1, 10 [94 Cal.Rptr.2d 829].) Reigelsperger did not try to terminate the arbitration agreement.

The Court of Appeal also concluded its construction was supported by the accompanying informed consent agreement, which provides in pertinent part: "I intend this consent form to cover the entire course of treatment for my present condition *and for any future condition(s)* for which I seek treatment." (Italics added.) The Court of Appeal reasoned, "[I]f the parties intended the arbitration agreement to apply to treatment of future conditions, they would have said so, as they did in the informed consent agreement. Because they did not, we find the arbitration agreement does not apply to future treatment of a different condition not contemplated by the parties at the time Reigelsperger signed the agreement in the absence of an ongoing doctor-patient relationship."

Logic and standard rules of construction undermine the Court of Appeal's reasoning. The informed consent agreement appears on page 2 of the arbitration form. Reigelsperger signed both at the same time. The two agreements should, therefore, be construed together. (Civ. Code, § 1642.)[6] The consent agreement states that it is intended to apply, not only to the "entire course of treatment for my present condition," but also to "any future condition(s) for which I seek treatment." The agreement's own terms provide additional evidence that the parties contemplated the possibility of future transactions for which they made provision in article 2.

Having concluded that the parties are obligated to arbitrate under article 2 of their agreement, we need not reach the question whether they are also obligated to do so under article 1.

---

[6] Civil Code section 1642 provides: "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together."

## DISPOSITION

We reverse the judgment of the Court of Appeal.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.