Filed 7/31/17

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| TALMADGE BAKER, Individually and as Personal Representative, etc., et al., Plaintiffs and Respondents, v. ITALIAN MAPLE HOLDINGS, LLC, et al., Defendants and Appellants. | D069797 (Super. Ct. No. 37-2015-00029207-CU-PO-NC) |

APPEAL from an order of the Superior Court of San Diego County, Earl H. Maas III, Judge.  Reversed.

Williams Iagmin and Jon R. Williams for Defendants and Appellants.

Pick Law and Lukas I. Pick for Plaintiffs and Respondents.

I.

INTRODUCTION

Marlene Baker LaBerge, a 73-year-old woman, was a resident and patient of a 24-hour skilled nursing facility owned by Italian Maple Holdings, LLC dba La Paloma Healthcare Center (La Paloma).  Approximately a week after LaBerge arrived at the facility, La Paloma's staff presented LaBerge with two arbitration agreements that

included language required by Code of Civil Procedure[1] section 1295, subdivision (c).

Section 1295, subdivision (c) requires such agreements to include a 30-day "cooling off" period, during which the parties to the agreement may rescind it. Ten days after LaBerge signed the agreements (and therefore, prior to the expiration of the statutorily-required 30-day rescission period), LaBerge passed away.

LaBerge's heirs, Paul LaBerge, Suzanne Marx, and Talmadge Baker (collectively Plaintiffs) sued La Paloma and Plum Healthcare, LLC (together Defendants) for elder abuse, violations of the Patient's Bill of Rights as codified at Health and Safety Code section 1430, negligence, and wrongful death. In response, Defendants filed a petition to compel arbitration based on the two arbitration agreements that LaBerge had executed. The superior court denied the petition to compel arbitration, relying on *Rodriguez v. Superior Court* (2009) 176 Cal.App.4th 1461 (*Rodriguez*) to conclude that the agreements were not effective until the 30-day rescission period passed without either party rescinding the agreements; because LaBerge died before the expiration of the 30-day rescission period, the agreements could not be given effect.

On appeal, Defendants contend that the trial court erred in concluding that the agreements were not effective until after the 30-day rescission period. They argue that this court should decline to follow *Rodriguez, supra*, 176 Cal.App.4th 1461 because that case is factually distinguishable from the instant matter, and further contend that the *Rodriguez* court erroneously interpreted section 1295, subdivision (c). Alternatively,

---

[1] Statutory references are to the Code of Civil Procedure unless otherwise specified.

Appellants maintain that this court should follow the recent case of *Scott v. Yoho* (2016) 248 Cal.App.4th 392 and conclude that the 30-day rescission period contained in section 1295, subdivision (c) violates the Federal Arbitration Act (FAA) and is thus preempted.

We conclude that the trial court erred in interpreting section 1295, subdivision (c), and that the arbitration agreements are valid and enforceable. In reaching this conclusion, we disagree with the court's analysis in *Rodriguez*, *supra*, 176 Cal.App.4th 1461. Section 1295, subdivision (c) establishes that an arbitration agreement executed by the parties "governs . . . until or unless" either party rescinds within the 30-day rescission period. In this case, the parties entered into two agreements that conform with the requirements of section 1295, and that specifically provide that they become effective *upon their execution*. Pursuant to the plain language of section 1295, subdivision (c), the terms of those agreements governed the parties' relationship upon their execution; the fact that one signatory died before the expiration of the statutory 30-day rescission period does not render the terms of the parties' agreements unenforceable in the absence of other grounds for not enforcing them.[2]

We therefore reverse the trial court's order denying Defendants' motion to compel arbitration.

---

[2]     Because our interpretation of the effect of section 1295, subdivision (c) requires reversal of the order denying Defendants' motion to compel arbitration, we decline to address Defendants' alternative arguments for reversal.

II.

FACTUAL AND PROCEDURAL BACKGROUND

LaBerge was admitted to La Paloma's 24-hour care nursing facility on September 18, 2014. At that time, she was diagnosed with high blood pressure and osteomyelitis (a bone infection).

A week after LaBerge's admission to the nursing facility, staff from the facility presented LaBerge with two arbitration agreements. The first one was entitled "Attachment F [¶] Arbitration of Medical Malpractice Disputes [¶] (Optional for Residents and Facility)" (Attachment F, some capitalization omitted). The second one was entitled "Attachment G [¶] Arbitration of Dispute Other Than Medical Malpractice [¶] (Optional for Residents and Facility)" (Attachment G, some capitalization omitted).

Attachments F and G both contained the following language:

> "By signing this arbitration agreement below, the Resident agrees to be bound by the foregoing arbitration provision. The Resident acknowledges that he or she has the option of not signing this arbitration agreement and not being bound by the arbitration provisions contained herein. The execution of this arbitration agreement is not a precondition to receiving medical treatment or for admission to the Facility. This arbitration agreement may be rescinded by written notice from either party, including the Resident's Legal Representative and/or Agent, if any, and as appropriate, to the other party within thirty (30) days of signature."

Both arbitration agreements bear a date stamp of September 25, 2014, which was seven days after LaBerge was admitted to the nursing facility. There is no other evidence in the record regarding when LaBerge signed these agreements or the circumstances surrounding her signing.

4

On October 5, 2014, LaBerge began sweating profusely and became very nauseated. The nursing facility staff found her vomiting in the restroom. The record discloses that LaBerge asked the staff for assistance, but the staff left LaBerge alone. At approximately 8:30 p.m., staff found LaBerge on the floor of the bathroom. Her face had turned blue. LaBerge had fallen and had sustained serious injuries to her head and body.

When the paramedics arrived, the nursing facility staff informed them that they had seen LaBerge suffer a heart attack.

LaBerge passed away after she was taken to the hospital. An autopsy revealed that she died as a result of blunt force injuries to her head and torso.

Plaintiffs, the heirs to LaBerge's estate, brought suit against Defendants, alleging four causes of action, including elder abuse, a violation of Health and Safety Code section 1430, negligence, and wrongful death. Defendants filed a petition to compel arbitration, asserting that LaBerge had agreed, pursuant to Attachments F and G, to arbitrate the claims asserted in the lawsuit brought by Plaintiffs. In setting forth their position, Defendants averred in their motion to compel arbitration that LaBerge was competent at the time she signed the agreements. In anticipation of an argument by Plaintiffs that the agreements at issue did not comply with certain requirements of section 1295, subdivision (c), Defendants also asserted that La Paloma was engaged in interstate commerce, that the arbitration agreements were therefore governed by the FAA, and that the FAA preempts

any state law requirements that apply only to certain arbitration agreements, and not to all contracts.[3]

Plaintiffs opposed the petition to compel arbitration, arguing that under the holding in *Rodriguez*, *supra*, 176 Cal.App.4th 1461, Defendants' motion to compel must be denied.

The trial court relied on *Rodriguez* to conclude that because LaBerge died before the expiration of the 30-day rescission period under section 1295, subdivision (c), Defendants could not establish that an enforceable arbitration agreement exists. The trial court did not address Defendants' contention that the FAA preempts the requirements imposed by section 1295, subdivision (c).

Defendants filed a timely appeal.

III.

DISCUSSION

A. *Standards relating to motions to compel arbitration*

The party seeking to compel arbitration has the burden of proving the existence of an enforceable arbitration agreement by a preponderance of the evidence, and a party opposing the petition bears the burden of proving by a preponderance any fact necessary

---

[3]    In making this argument, Appellants chose not to provide evidence to support their contention that La Paloma is engaged in interstate commerce, and instead relied on the United States Supreme Court's opinion in *Summit Health, Ltd. v. Pinhas* (1991) 500 U.S. 322 (*Summit Health, Ltd.*) to argue that "commerce" for purposes of FAA coverage, includes a health provider's treatment of Medicare patients, receipt of reimbursement from Medicare, and purchase of out-of-state medicines and supplies. (See *Summit Health, Ltd.*, *supra*, at pp. 327–329.)

to its defense. (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972 (*Engalla*); *Rosenthal v. Great Western Fin. Securities Corp*. (1996) 14 Cal.4th 394, 413 (*Rosenthal*) ["Because the existence of the agreement is a statutory prerequisite to granting the petition [to compel arbitration], the petitioner bears the burden of proving its existence by a preponderance of the evidence. If the party opposing the petition raises a defense to enforcement—either fraud in the execution voiding the agreement, or a statutory defense of waiver or revocation [citation]—that party bears the burden of producing evidence of, and proving by a preponderance of the evidence, any fact necessary to the defense."].)

In considering a petition to compel arbitration, "the court sits as a trier of fact, weighing all the affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion to reach a final determination." (*Engalla*, *supra*, 15 Cal.4th at p. 972.) At a hearing on a petition to compel arbitration, the issue of whether an arbitration agreement exists is a "preliminary question to be determined by the court . . . ." (*Pagett v. Hawaiian Ins. Co.* (1975) 45 Cal.App.3d 620, 622; see § 1281.2.) If that preliminary question requires the resolution of factual issues, then the court must resolve such issues in the course of the hearing on the petition.

" 'Ordinarily, we review a denial of a petition to compel arbitration for abuse of discretion. [Citation.] However, where the trial court's denial of a petition to arbitrate presents a pure question of law, we review the order de novo.' " (*Mendez v. Mid-Wilshire Health Care Center* (2013) 220 Cal.App.4th 534, 541.) If the superior court's decision regarding arbitrability is based on resolution of disputed facts, we review the decision for

7

substantial evidence. (*Engineers & Architects Assn. v. Community Development Dept.* (1994) 30 Cal.App.4th 644, 653.) To the extent the denial of the petition to compel arbitration involves the interpretation of a statute, we review the trial court's interpretation of the relevant statutory language de novo. (*Mesa Shopping Center-East, LLC v. Hill* (2014) 232 Cal.App.4th 890, 899.)

B. *Analysis*

    1. *The statutory framework*

Section 1295 addresses arbitration agreements in medical services contracts. The Supreme Court has stated that "[t]he purpose of section 1295 is to encourage and facilitate arbitration of medical malpractice disputes. [Citations.] Accordingly, the provisions of section 1295 are to be construed liberally [to support that legislative purpose]." (*Reigelsperger v. Siller* (2007) 40 Cal.4th 574, 578 (*Reigelsperger*).)

The provisions of section 1295 dictate the form, and to some degree the substance, of such agreements. For example, subdivisions (a) and (b) of section 1295 require the presence of certain language in medical services arbitration agreements, and also specify certain font and color requirements.[4] (*Reigelsperger*, *supra*, 40 Cal.4th at p. 578; *Titolo v. Cano* (2007) 157 Cal.App.4th 310, 319.)

---

4     Section 1295, subdivision (a) provides: "Any contract for medical services which contains a provision for arbitration of any dispute as to professional negligence of a health care provider shall have such provision as the first article of the contract and shall be expressed in the following language: 'It is understood that any dispute as to medical malpractice, that is as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently or incompetently rendered, will be determined by submission to arbitration as provided by California law, and not by

The principal dispute in this case involves section 1295, subdivision (c), which provides: "Once signed, such a contract governs all subsequent open-book account transactions for medical services for which the contract was signed until or unless rescinded by written notice within 30 days of signature. Written notice of such rescission may be given by a guardian or conservator of the patient if the patient is incapacitated or a minor."

Section 1295, subdivision (e) provides that a medical services arbitration agreement "is not a contract of adhesion, nor unconscionable nor otherwise improper, where it complies with subdivisions (a), (b) and (c) of this section."

> 2. *Section 1295, subdivision (c) does not create a condition precedent to the enforceability of a medical services arbitration agreement; as a result, a party's death during the 30-day rescission window does not invalidate an otherwise enforceable agreement*

Defendants claim that the trial court erred in concluding that they failed to meet their burden of proving the existence of an enforceable arbitration agreement by a preponderance of the evidence. Relying on *Rodriguez*, *supra*, 176 Cal.App.4th 1461, the trial court concluded that Defendants could not establish the validity of the subject arbitration agreements because LaBerge died prior to the expiration of the 30-day

a lawsuit or resort to court process except as California law provides for judicial review of arbitration proceedings. Both parties to this contract, by entering into it, are giving up their constitutional right to have any such dispute decided in a court of law before a jury, and instead are accepting the use of arbitration.' "

Section 1295, subdivision (b) provides: "Immediately before the signature line provided for the individual contracting for the medical services must appear the following in at least 10-point bold red type: [¶] 'NOTICE: BY SIGNING THIS CONTRACT YOU ARE AGREEING TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE DECIDED BY NEUTRAL ARBITRATION AND YOU ARE GIVING UP YOUR RIGHT TO A JURY OR COURT TRIAL. SEE ARTICLE 1 OF THIS CONTRACT.' "

rescission period set forth in section 1295, subdivision (c). Defendants contend that the trial court erred in denying their motion to compel arbitration based on *Rodriguez*, in part because, Defendants maintain, the *Rodriguez* court incorrectly interpreted section 1295, subdivision (c).

In support of their motion to compel arbitration, Defendants offered copies of Attachments F and G. Plaintiffs do not dispute that these arbitration agreements were executed by LaBerge and Defendants. Rather, in the trial court and on appeal, Plaintiffs maintained that because section 1295, subdivision (c) provides that parties may rescind a medical services arbitration agreement within 30 days of signing the agreement, such an agreement is not enforceable until after that 30-day period has elapsed. Plaintiffs rely on *Rodriguez* to argue that where, as here, one of the parties to an arbitration agreement dies before the end of the 30-day rescission period, "it is impossible to establish an enforceable arbitration agreement exists."

In *Rosenthal*, *supra*, 14 Cal.4th at p. 413, the Supreme Court explained the burden shifting that occurs with respect to a motion to compel arbitration: "[W]hen a petition to compel arbitration is filed and accompanied by prima facie evidence of a written agreement to arbitrate the controversy, the court itself must determine whether the agreement exists and, if any defense to its enforcement is raised, whether it is enforceable. Because the existence of the agreement is a statutory prerequisite to granting the petition, the petitioner bears the burden of proving its existence by a preponderance of the evidence. If the party opposing the petition raises a defense to enforcement . . . that party

10

bears the burden of producing evidence of, and proving by a preponderance of the evidence, any fact necessary to the defense."

With respect to the moving party's burden to provide evidence of the *existence* of an agreement to arbitrate, it is generally sufficient for that party to present a copy of the contract to the court. (See *Condee v. Longwood Management Corp.* (2001) 88 Cal.App.4th 215, 218 (*Condee*); see also Cal. Rules of Court, rule 3.1330 ["A petition to compel arbitration or to stay proceedings pursuant to Code of Civil Procedure sections 1281.2 and 1281.4 must state, in addition to other required allegations, the provisions of the written agreement and the paragraph that provides for arbitration. The provisions must be stated verbatim or a copy must be physically or electronically attached to the petition and incorporated by reference"].) Once such a document is presented to the court, the burden shifts to the party opposing the motion to compel, who may present any challenges to the enforcement of the agreement and evidence in support of those challenges. (See *Rosenthal*, *supra*, 14 Cal.4th at p. 413.)

There is no real dispute that the parties entered into and *executed* arbitration agreements regarding the services that provide the basis for Plaintiffs' lawsuit. Defendants presented to the court Attachments F and G, both executed by LaBerge and La Paloma. Attachment F includes the following relevant language:

> "The parties understand that any dispute as to medical malpractice (that is, whether any medical services rendered under this admission agreement were necessary or unauthorized or were improperly, negligently or incompetently rendered), will be determined by submission to neutral arbitration as provided by California law, and not by a lawsuit or court process, except as California law provides for judicial review of arbitration proceedings. By entering into this arbitration agreement, both parties give up their constitutional right to have

11

any such dispute decided in a court of law before a jury, and instead accept the use of arbitration. [¶] *By signing this arbitration agreement below, the Resident agrees to be bound by the foregoing arbitration provision. . . .*

"[¶] . . . [¶]

"NOTICE: BY SIGNING THIS AGREEMENT THE RESIDENT AGREES TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE DECIDED BY NEUTRAL ARBITRATION, AND GIVES UP THE RIGHT TO A JURY OR COURT TRIAL."  (Italics added.)

Attachment G includes the following relevant language:

"The parties understand that, except as provided below, any claim other than a claim for medical malpractice, arising out of the provision of services by the Facility, the admission agreement, the validity, interpretation, construction, performance and enforcement thereof, or which allege violations of the Elder Abuse and Dependent Adult Civil Protection Act, or the Unfair Competition Act, or which seek an award of punitive damages or attorneys' fees, will be determined by submission to neutral arbitration as provided by California law, and not by a lawsuit or court process, except as California law provides for judicial review of arbitration proceedings.  By entering into this arbitration agreement, both parties give up their constitutional right to have any such dispute decided in a court of law before a jury, and instead accept the use of arbitration. [¶] *By signing this arbitration agreement below, the Resident agrees to be bound by the foregoing arbitration provision. . . .*

"[¶] . . . [¶]

"NOTICE: BY SIGNING THIS AGREEMENT THE RESIDENT AGREES TO HAVE ANY CLAIM MADE ON BEHALF OF THE RESIDENT ARISING OUT OF THE PROVISION OF SERVICES BY THE FACILITY, THE ADMISSION AGREEMENT OR THE VALIDITY, INTERPRETATION, CONSTRUCTION, PERFORMANCE AND ENFORCEMENT THEREOF, OR WHICH ALLEGE VIOLATIONS OF THE ELDER ABUSE AND DEPENDENT ADULT CIVIL PROTECTION ACT, OR THE UNFAIR COMPETITION ACT, OR WHICH SEEK AN [A]WARD OF PUNITIVE DAMAGES OR ATTORNEYS' FEES, DECIDED BY NEUTRAL ARBITRATION, AND GIVES UP THE RIGHT TO A JURY OR COURT TRIAL."  (Italics added.)

In submitting these arbitration agreements to the trial court, Defendants made a sufficient prima facie showing of the existence of agreements to arbitrate between LaBerge[5] and Defendants. (See *Molecular Analytical Systems v. Ciphergen Biosystems, Inc.* (2010) 186 Cal.App.4th 696, 701–702 [concluding that defendants had "made a sufficient prima facie showing of an agreement to arbitrate, based not only on the allegations of the complaint but also on their moving papers and on their proffer of the [agreement]"]; see also *Condee*, *supra*, 88 Cal.App.4th at p. 218 [concluding that a petitioner is not required to authenticate an opposing party's signature on an arbitration agreement in the event the authenticity of the signature is not challenged].)

Because Plaintiffs did not dispute that LaBerge signed the agreements, the burden shifted to the Plaintiffs to raise any defenses that they might have to enforcement of the agreements. (See *Rosenthal*, *supra*, 14 Cal.4th at p. 413.) Plaintiffs have not asserted, either in the trial court or on appeal, that LaBerge did not have the capacity to execute the agreements, nor have they raised a contention that the agreements were executed as a result of fraud, duress, or undue influence, such that the agreements may not be enforced.[6] Rather, Plaintiffs' main contention is that pursuant to section 1295,

---

[5]    A medical services arbitration agreement entered into in compliance with section 1295 may bind a signatory's heir in seeking a claim based on wrongful death or other cause of action arising from the signatory's medical treatment. (*Ruiz v. Podolsky* (2010) 50 Cal.4th 838, 854.) Plaintiffs do not challenge that the subject arbitration agreements, if valid, apply to them.

[6]    Plaintiffs do assert in briefing on appeal that "[t]here is no evidence the agreements were explained to her, or understood by her." In making this assertion, Plaintiffs appear to suggest that Defendants were required to present evidence with respect to their motion to compel to the effect that LaBerge understood the document. However, it is well

13

subdivision (c), as interpreted by the court in *Rodriguez*, the arbitration agreements at issue were not immediately enforceable upon their execution. Rather, according to Plaintiffs, the 30-day rescission period granted to parties to medical services arbitration agreements by section 1295, subdivision (c) must fully elapse before a medical services arbitration agreement may be enforced.

In *Rodriguez*, *supra*, 176 Cal.App.4th 1461, the decedent executed a physician-patient arbitration agreement four days before undergoing gallbladder surgery. (*Id.* at pp. 1464–1465.) The decedent died shortly after the surgery, allegedly from a nick to her liver that the surgeon caused during the procedure. (*Id.* at p. 1465.) The decedent's minor child sued the surgeon and others for wrongful death, and the surgeon moved to compel arbitration of the decedent's heir's claim. The superior court granted the petition to

established that a party who signs a document is presumed to have read it and to understand its contents. (E.g., *Stewart v. Preston Pipeline Inc.* (2005) 134 Cal.App.4th 1565, 1588–1589; *Randas v. YMCA of Metropolitan Los Angeles* (1993) 17 Cal.App.4th 158, 163; *Estate of Johanson* (1943) 62 Cal.App.2d 41, 54.) It would be Plaintiffs' burden to overcome this presumption; Defendants bore no burden to present affirmative evidence that the agreements were explained to LaBerge or that she understood them, or to otherwise preemptively negate any affirmative defense that Plaintiffs might have to the enforcement of the agreements.

Despite the existence of the presumptions that accompany an executed document, and despite the fact that Plaintiffs have never challenged the circumstances surrounding LaBerge's execution of the relevant documents or her capacity to execute them, the dissent raises the concern that we simply do not know enough about the circumstances surrounding LaBerge's execution of the agreements to give them valid legal effect. The dissent would apparently impose an unprecedented requirement that would seem to apply in *any* case involving an arbitration agreement—i.e., that, even in the absence of a challenge, the defendant must present evidence of the circumstances of the signing of the arbitration agreement and prove that the plaintiff knowingly and voluntarily waived her right to jury trial, notwithstanding the presence of clear language to that effect in the executed arbitration agreement.

14

compel arbitration. (*Id.* at p. 1466.) The plaintiff then filed a petition for a writ of mandate. (*Id.* at p. 1464.)

In concluding that the trial court erred in granting the motion to compel arbitration of the decedent's heir's claim, the *Rodriguez* court determined that the medical services arbitration agreement was unenforceable because the decedent's death "shortly after the [initial] surgery rendered it impossible to make any evidentiary finding regarding whether [the decedent's] alleged waiver of her rights, not to mention the child's rights, to a jury trial was knowing and voluntary." (*Rodriguez*, *supra*, 176 Cal.App.4th at p. 1469.) The court explained:

> "[Decedent] was presented with the Arbitration Agreement only four days before her scheduled surgery under circumstances in which she could have believed she must sign the agreement in order to have [defendant surgeon] perform the surgery. There is no evidence that she would or would not have reread and reconsidered the Arbitration Agreement after her surgery or that she would or would not have exercised her right to 'revoke' the agreement within the statutory 30-day revocation period. [Citation.] [Decedent] signed the Arbitration Agreement herself, not through someone authorized to do so on her behalf, and, hence, the determinative factor is [decedent's] intent, not the intent of some representative appointed after her death. [Citation.] [Decedent's] death shortly after the [initial] surgery rendered it impossible to make any evidentiary finding regarding whether [decedent's] alleged waiver of her rights, not to mention the child's rights, to a jury trial was knowing and voluntary. [Decedent's] death prior to the expiration of the 30-day 'cooling off' period also made it impossible for full compliance with section 1295 requirements. A statutory prerequisite to an enforceable arbitration agreement under section 1295 is that the person signing the agreement must have 30 days to review the agreement and reconsider whether he or she knowingly and voluntarily intends to waive the right to a jury trial or, alternatively, desires to rescind the agreement. (§ 1295, subd. (c).) *Thus, [decedent's] death prior to the expiration of the 30-day period rendered it impossible to establish that an arbitration agreement exists that is enforceable under section 1295.* Given the foregoing facts, we conclude that [defendant surgeon] would be unable to carry his burden of proving that an agreement exists." (*Id.* at pp. 1469–1470, italics added.)

15

By this reasoning, the *Rodriguez* court suggests that section 1295, subdivision (c) creates a condition precedent to the enforcement of the terms of a medical services arbitration agreement contract—the condition precedent being the lapsing of the 30-day rescission period without either party rescinding.  In our view, this interpretation of section 1295, subdivision (c) fails to adequately take into account the statutory language.  Section 1295, subdivision (c) provides in relevant part:  "*Once signed, such a contract governs* all subsequent open-book account transactions for medical services for which the contract was signed *until or unless rescinded* by written notice within 30 days of signature."  (§ 1295, subd. (c), italics added.)   The plain meaning of this provision is that a medical services agreement is effective upon execution by the parties and remains in effect until or unless a party rescinds within the 30-day period.  Both of the agreements in this case clearly indicate the parties' intent that the agreements were to become valid and enforceable upon their execution, since, in addition to setting forth the language of section 1295, subdivision (c), both agreements state, "By signing this arbitration agreement below, the Resident agrees to be bound by the foregoing arbitration provision," and "BY SIGNING THIS AGREEMENT THE RESIDENT AGREES TO" the arbitration of the identified claims and/or issues.  This language indicates a clear intention to obligate the parties, pursuant to the agreements, immediately upon the execution of the documents.[7]

---

[7]     Presumably, however, a contract itself could demonstrate the parties' intent to create a condition precedent to the contract's enforcement.

16

If the Legislature had intended to delay the enforceability of a medical services arbitration agreement for 30 days *after* the signing of such an agreement, even where the parties indicated an intention to make their obligations under the agreement enforceable upon signing, it could easily have done so by stating that such an agreement does not become enforceable until a 30-day "grace period" elapses after execution of the document. (See Civ. Code, § 1695.6 [in context of home equity sales contracts, providing that "[u]ntil the time within which the equity seller may cancel the transaction has fully elapsed, the equity purchaser shall not" perform under the contract].)  Instead, the Legislature chose to provide parties to a medical services arbitration agreement a statutory right to *rescind* an otherwise enforceable agreement within 30 days of signing it.  Where the terms of such an agreement indicate that the parties have agreed to arbitrate claims immediately upon the signing of the agreement, those terms *govern* the parties' relationship "until and unless" a party rescinds within the 30-day statutory rescission period.

The medical services arbitration agreements in this case exhibit the parties' intention that the agreements become enforceable immediately upon execution; that one of the parties died during the 30-day rescission period does not negate this express intention.  Until the time of LaBerge's death, neither party had rescinded the agreements; the agreements therefore remained in effect and enforceable at the time of her death.

We reach this conclusion with the understanding that our result is in conflict with the interpretation of section 1295, subdivision (c) provided by the court in *Rodriguez.* However, we do not believe that language of section 1295, subdivision (c) can reasonably

be interpreted as creating a statutory condition precedent to the enforceabilty of the parties' obligations under a contract. In reaching a different conclusion, the *Rodriguez* court appears to have conflated the question whether a contract for which the statute grants a 30-day rescission right is immediately enforceable with the question whether such an agreement was entered into knowingly and voluntarily. (See *Rodriguez*, *supra*, 176 Cal.App.4th at p. 1469 ["A statutory prerequisite to an enforceable arbitration agreement under section 1295 is that the person signing the agreement must have 30 days to review the agreement and reconsider whether he or she knowingly and voluntarily intends to waive the right to a jury trial or, alternatively, desires to rescind the agreement"].) In other words, the *Rodriguez* court suggests that in the absence of the lapsing of the 30-day rescission period granted by section 1295, subdivision (c), one cannot conclude that a medical services contract was entered into knowingly and voluntarily. However, section 1295, subdivision (c) does not purport to create a presumption against a finding that a medical services contract was entered into knowingly and voluntarily where a party dies before the full 30 days for rescission has elapsed. Rather, section 1295, subdivision (c) presumes that the parties are capable of entering into a fully enforceable and *governing* contract upon the signing of the contract, and merely grants them the opportunity to change their minds within 30 days of executing a fully enforceable contract. Indeed, the *Rodriguez* court's choice of language ultimately reveals the error in its reasoning; the *Rodriguez* court refers to the 30-day period as providing a party the chance to "reconsider" his or her decision (see *Rodriguez*, *supra*, at p. 1469). The statute's granting of an opportunity to *reconsider* a decision does not suggest that a

18

party cannot be determined to have knowingly and voluntarily considered the decision in the first place.

Plaintiffs have not alleged, let alone demonstrated, that LaBerge lacked capacity to assent to the agreements, that she did so only under duress or coercion, or that for some other reason she should not be bound by the provisions of the agreements. (See *Ramirez v. Superior Court* (1980) 103 Cal.App.3d 746, 756 [despite the presumption that compliance with the terms of section 1295 demonstrates that an agreement is not a contract of adhesion, section 1295 continues to permit a party to seek to show that he or she did not actually consent to arbitration, but was coerced into signing or did not read the many waiver notices provided and failed to realize that the agreement was an agreement to arbitrate].) Under these circumstances, we conclude that LaBerge consented to arbitrate any potential claims consistent with the terms outlined in Attachments F and G, and that her consent remained in effect up until the time of her passing. We respectfully disagree with the *Rodriguez* opinion to the extent that it suggests otherwise.

3. *The arbitration agreements sufficiently comply with the requirements of section 1295*

Plaintiffs contend that the arbitration agreements do not comply with section 1295's requirements because with respect to certain language the agreements "have paraphrased several provisions" and "fail[ ] to include important several [*sic*] sections of the mandatory language." Specifically, Plaintiffs point out that instead of referring to the document as a "contract" it is referred to as an "agreement," and fails to include the phrase "See Article 1 of this Contract." In addition, Plaintiffs assert that "Defendants also

19

changed some of the mandatory language required [by section 1295] in the first paragraph of the agreement," but they do not specify what language was changed.[8] Plaintiffs suggest that the arbitration agreements are unenforceable because of these discrepancies,

---

[8] Again, the first paragraph of Attachment F states:

"The parties understand that any dispute as to medical malpractice (that is, whether any medical services rendered under this admission agreement were necessary or unauthorized or were improperly, negligently or incompetently rendered), will be determined by submission to neutral arbitration as provided by California law, and not by a lawsuit or court process, except as California law provides for judicial review of arbitration proceedings. By entering into this arbitration agreement, both parties give up their constitutional right to have any such dispute decided in a court of law before a jury, and instead accept the use of arbitration."

The first paragraph of Attachment G states:

"The parties understand that, except as provided below, any claim other than a claim for medical malpractice, arising out of the provision of services by the Facility, the admission agreement, the validity, interpretation, construction, performance and enforcement thereof, or which allege violations of the Elder Abuse and Dependent Adult Civil Protection Act, or the Unfair Competition Act, or which seek an award of punitive damages or attorneys' fees, will be determined by submission to neutral arbitration as provided by California law, and not by a lawsuit or court process, except as California law provides for judicial review of arbitration proceedings. By entering into this arbitration agreement, both parties give up their constitutional right to have any such dispute decided in a court of law before a jury, and instead accept the use of arbitration."

For comparison, section 1295, subdivision (a) sets forth the following language that is to be included in medical services arbitration agreements:

" 'It is understood that any dispute as to medical malpractice, that is as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently or incompetently rendered, will be determined by submission to arbitration as provided by California law, and not by a lawsuit or resort to court process except as California law provides for judicial review of arbitration proceedings. Both parties to this contract, by entering into it, are giving up their constitutional right to have any such dispute decided in a court of law before a jury, and instead are accepting the use of arbitration.' "

20

and that the existence of these discrepancies provides an alternative ground to affirm the trial court's order.

We conclude that the minor discrepancies that Plaintiffs identify are immaterial for purposes of evaluating the validity of the arbitration agreements, because the agreements substantially comply with all of the material requirements set forth in section 1295. "[T]he doctrine [of substantial compliance] excuses literal noncompliance only when there has been 'actual compliance in respect to the substance essential to every reasonable objective of the statute.' " (*Robertson v. Health Net of California, Inc.* (2005) 132 Cal.App.4th 1419, 1430.) " ' "Where there is compliance as to all matters of substance[,] technical deviations are not to be given the stature of noncompliance. [Citation.] Substance prevails over form." ' " (*Malek v. Blue Cross of California* (2004) 121 Cal.App.4th 44, 72 (*Malek*).)

While "there is some doubt whether" statutes regulating arbitration clauses, whose provisions tend to demand certain technical compliance, "permit[ ] mere substantial compliance" (*Zembsch v. Superior Court* (2006) 146 Cal.App.4th 153, 166 (*Zembsch*)) [addressing and rejecting argument that arbitration clause substantially complied with requirements of Health and Safety Code section 1363.1, which requires health care service plans to disclose the requirement of binding arbitration in a manner that is " 'prominently displayed on the enrollment form signed by each subscriber or enrollee' "]), courts have been unwilling to entirely rule out the doctrine's application with respect to otherwise mandatory provisions regulating arbitration clauses in an appropriate case. (*Zembsch*, *supra*, at p. 166; *Malek*, *supra*, 121 Cal.App.4th at p. 72.) Indeed, it could be

21

inequitable to deny effect to an arbitration provision because of an omission of an immaterial word or punctuation mark, or a slight variance in wording, if made inadvertently and without an intention to distract from the objectives of the statutory requirements. (See *Costa v. Superior Court* (2006) 37 Cal.4th 986, 1027–1030.)

This case presents an appropriate case for application of the substantial compliance doctrine. Our primary concern is the objective of the statute. The purpose of section 1295 is to " 'encourage[ ] and facilitate[ ] the *arbitration* of medical malpractice disputes by specifying uniform language to be used in binding arbitration contracts to assure that the patient knows what he is signing and what its ramifications are.' " (*Gross v. Recabaren* (1988) 206 Cal.App.3d 771, 776; *County of Contra Costa v. Kaiser Foundation Health Plan, Inc.* (1996) 47 Cal.App.4th 237, 246 [same].) There is no reasonable basis for concluding that the arbitration agreements executed by LaBerge do not adequately meet the material requirements of section 1295, and thus fulfill the purpose of ensuring that an individual in LaBerge's position is on notice of what he or she is agreeing to, including the fact that by giving assent, he or she is *waiving the right to have a jury decide matters covered by the agreement*. We see no material difference between the relevant language in the documents that were presented to LaBerge for her signature, and the language required by section 1295 to ensure adequate protections for individuals seeking to obtain medical services. The discrepancies identified by Plaintiffs are trivial (such as use of the word "agreement" instead of the word "contract" in a required paragraph), and in no way undermine the fact that the agreements adequately

22

emphasize—and reiterate, as required, in red, bold, capitalized print just above the signature lines—that the patient is waiving the right to a jury trial.

## IV.

## DISPOSITION

The order is reversed.  Costs are awarded to Defendants.


                                                              AARON, J.

I CONCUR:

O'ROURKE, J.

J. HUFFMAN, dissenting.

Marlene Baker LaBerge, a 73-year-old woman, who needed 24-hour care, signed two arbitration agreements seven days after she was admitted to a nursing facility owned by Italian Maple Holdings, LLC dba La Paloma Healthcare Center (La Paloma).  She died 10 days later allegedly because of the misconduct of La Paloma agents.  Her heirs, Paul LaBerge, Suzanne Markz, and Talmadge Baker (collectively Plaintiffs), filed suit against La Paloma and Plum Healthcare, LLC (together Defendants).  In response, Defendants submitted a petition to compel arbitration.  Following *Rodriguez v. Superior Court* (2009) 176 Cal.App.4th 1461 (*Rodriguez*), the superior court denied the motion.

The majority reverses the court's order, determining that *Rodriquez* was wrongly decided.  In doing so, the majority focuses solely on the text of Code of Civil Procedure[9] section 1295, subdivision (c).  Although I do not quibble with the majority's interpretation of that subdivision, I conclude that the statute must be considered in the context of determining whether LaBerge waived her constitutional right to a jury trial.  This is especially important when addressing a consumer protection statute like section 1295.  Under the facts of this case, I would follow *Rodriguez*, *supra*, 176 Cal.App.4th 1461, and find that Defendants did not show LaBerge knowingly and voluntarily waived her constitutional right to a jury trial.  (See *id*. at pp. 1469-1470.)  Accordingly, I dissent.

The majority correctly notes that a party petitioning to compel arbitration must first offer evidence of a written agreement to arbitrate the subject dispute.  (See *Rosenthal*

---

9       Statutory references are to the Code of Civil Procedure unless otherwise specified.

*v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 413.)  Here, Defendants offered copies of two arbitration agreements LaBerge purportedly signed.  The majority points out that Plaintiffs did not dispute that Defendants and LaBerge signed the two arbitration agreements.  However, one wonders how Plaintiffs could do so.  They were not present when LaBerge signed the agreements, and LaBerge passed away shortly after executing the agreements.  Indeed, there is no indication in the record that Plaintiffs were aware of the arbitration agreements until after they filed the instant action.

Defendants offered no details regarding LaBerge's execution of the two arbitration agreements.  Defendants did not explain why LaBerge was not asked to sign the arbitration agreements with the other admission paperwork she executed and/or received before her admission to the nursing facility.  The record does not indicate under what circumstances LaBerge signed the agreements or how the agreements were presented to her seven days after she was admitted to La Paloma's nursing facility.  Indeed, Defendants' trial attorney authenticated the two arbitration agreements.  Because Plaintiffs did not object to this method of authentication, we do not know what personal knowledge Defendants' trial attorney possessed that allowed him to authenticate the agreements.  In his declaration, the attorney does not state that he was present when LaBerge executed the agreements or he is otherwise familiar with her signature.  Thus, we are left with a 73-year-old woman in need of 24-hour care, signing two agreements,

2

under unknown circumstances, purportedly waiving her constitutional right to a jury trial, seven days after she was admitted to La Paloma's nursing facility.[10]

The majority glosses over this background, emphasizing that Plaintiffs did not argue LaBerge lacked the capacity to execute the agreements or contend the agreements are the result of fraud, duress, or undue influence.[11] Observing these omissions, the majority then correctly states that Plaintiffs' main argument is that the instant petition to compel arbitration must fail under *Rodriguez*, *supra*, 176 Cal.App.4th 1461. Because the majority holds that the appellate court misinterpreted section 1295, subdivision (c) in *Rodriguez*, it concludes the superior court erred in following *Rodriguez* below. Put differently, the majority determines that section 1295, subdivision (c) makes the subject arbitration agreements immediately enforceable, unless or until, LaBerge rescinded them. Because LaBerge did not rescind them before her death, it does not matter that she still had 20 days in which to rescind them at the time she died. Nor does it matter that we know not the circumstances under which she signed the agreements. Under the majority's interpretation, per section 1295, subdivision (c), it is enough that Defendants

---

[10]     Defendants also submitted four exhibits consisting of various medical evaluations of LaBerge. Defendants maintained that these documents proved LaBerge was competent to execute the arbitration agreements. We observe that none of these documents describe the circumstances of LaBerge's execution of the arbitration agreements. Further, Defendants' trial counsel authenticated these documents with no indication that he had sufficient personal knowledge to do so or otherwise explain their contents.

[11]     Although we agree these issues were not raised, we question how Plaintiffs could have properly raised these issues when they were not present during the execution of the arbitration agreements and have no knowledge regarding the circumstances of their execution.

3

produce the signed arbitration agreements. I believe such a strict rule does not properly consider the importance of a party waiving his or her constitutional right to a jury trial and that such a waiver must be knowingly and voluntarily made. Nor does the rule articulated by the majority sufficiently consider, in my opinion, the context in which LaBerge signed the arbitration agreements. Instead, I think the appellate court in *Rodriguez* correctly balanced the competing interests of an individual's constitutional right to a jury trial against the preference for arbitration of medical malpractice claims codified in section 1295. I would follow *Rodriguez*, *supra*, 176 Cal.App.4th 1461 here.

As part of the Medical Injury Compensation Reform Act, the Legislature enacted section 1295 "to encourage and facilitate arbitration of medical malpractice claims." (*Reigelsperger v. Siller* (2007) 40 Cal.4th 574, 578.) Thus, as the appellate court noted in *Rodriguez*, "[s]ection 1295 provides a procedure for a patient and a health care provider to enter into an agreement to waive their rights to a jury trial and resolve medical malpractice claims by arbitration." (*Rodriguez, supra,* 176 Cal.App.4th at p. 1467.)

The court in *Rodriguez* considered waiver in the context of section 1295, subdivision (c).[12] Specifically, the court discussed the importance of determining whether a party has in fact consented to arbitrate disputes and waived its right to a jury trial:

---

[12]    Section 1295, subdivision (c) provides: "Once signed, such a contract governs all subsequent open-book account transactions for medical services for which the contract was signed until or unless rescinded by written notice within 30 days of signature. Written notice of such rescission may be given by a guardian or conservator of the patient if the patient is incapacitated or a minor."

"There is, however, no conclusive presumption that a person who signs a document containing text complying with section 1295 requirements has in fact consented to arbitration as required to form an enforceable agreement. [Citation.] . . . As for any contract to be valid, an arbitration agreement requires mutual consent of the parties. [Citation.] No enforceable agreement 'exists unless the parties signing the document act voluntarily and are aware of the nature of the document and have turned their attention to its provisions.' [Citation.] In order to allow a patient sufficient time to rescind the agreement or, by his or her silence, confirm that his or her waiver is knowing and voluntary, section 1295, subdivision (c) requires that the patient be given a 30-day 'cooling off' period after signing the agreement. During that time, the patient may rescind the agreement by giving written notice of rescission." (*Rodriguez*, *supra*, 176 Cal.App.4th at p. 1468.)

As relevant here, the appellate court interpreted subdivision (c) as including a specific, statutory protection for a patient signing an arbitration agreement: "A statutory prerequisite to an enforceable arbitration agreement under section 1295 is that the person signing the agreement must have 30 days to review the agreement and reconsider whether he or she knowingly and voluntarily intends to waive the right to a jury trial or, alternatively, desires to rescind the agreement." (*Rodriguez*, *supra*, 176 Cal.App.4th at p. 1469.) In interpreting section 1295, subdivision (c), the appellate court determined that it could not find the decedent waived her right to a jury trial (or her child's right to same) because the decedent died before the expiration of the 30-day cooling off period. In this sense, the appellate court suggested the arbitration agreement could not be enforceable until the expiration of the 30-day period in which a signatory could rescind the agreement, unless it could be shown that the signatory would not have rescinded it. In interpreting section 1295, subdivision (c) in this manner, the court explicitly rejected the defendant doctor's proposed interpretation that subdivision (c) created an enforceable

5

waiver simply by the passage of 30 days, regardless of whether the party was alive and able throughout the 30-day cooling off period to exercise the party's right of rescission. The court commented that such an interpretation would violate "the principle that the statute's requirements for waiver be interpreted as strict and exclusive." (*Rodriguez*, *supra*, 176 Cal.App.4th at p. 1470.)

However, the majority does not read section 1295, subdivision (c) the same way as the appellate court in *Rodriguez, supra,* 176 Cal.App.4th 1461. Here, the majority emphasizes that the subject arbitration agreements exhibit the parties' intention that the agreements become enforceable immediately upon execution and the fact LaBerge died before the expiration of the 30-day rescission period does not negate this intention. Again, I am concerned that the majority's approach does not sufficiently consider the circumstances of the execution of the subject agreements, the details of which are largely unknown in the instant matter.

The majority takes issue with the appellate court's interpretation of section 1295, subdivision (c) in *Rodriguez*, *supra*, 176 Cal.App.4th 1461, specifically that court's contention that the subdivision creates a statutory condition precedent to the enforceability of an arbitration agreement in the context of a medical malpractice claim. The majority faults the appellate court with conflating the question whether a contract for the statute that grants a 30-day rescission right is immediately enforceable with the question whether such an agreement was entered into knowingly and voluntarily. (See *id.* at p. 1469.) The majority therefore holds that the statute's allowance of a party to

6

reconsider his or her decision does not suggest that a party cannot be determined to have knowingly and voluntarily considered the decision in the first place. The majority's analysis, however, begs the question, did Defendants prove LaBerge knowingly and voluntarily waive her constitutional right to a jury trial under the facts of this case. Because Defendants had the burden below and there is no evidence whatsoever in the record regarding the circumstances of LaBerge's execution of the agreements, I would answer this question in the negative, under the specific facts of this case.

Here, a 73-year-old woman in need of 24-hour care was asked to sign two arbitration agreements seven days after she was admitted to La Paloma's nursing facility. She died 10 days later, allegedly because La Paloma's staff abandoned her and purposefully withheld care. In petitioning to compel arbitration, Defendants did not offer any evidence regarding the circumstances of LaBerge's execution of the subject arbitration agreements. Alternatively stated, but for the signed arbitration agreements that LaBerge could have rescinded at the time of her death, Defendants did not provide any evidence that LaBerge knowingly and voluntarily waived her constitutional right to a jury trial. Accordingly, I cannot say that Defendants carried their burden in their petition to compel arbitration. Such a determination is made even more difficult because LaBerge still had 20 days in which to rescind her consent to the arbitration agreements at the time of her death. And, according to Plaintiffs, it is Defendants' conduct that deprived LaBerge of those additional 20 days. As such, under these circumstances, I would follow

7

*Rodriguez* and determine that the subject arbitration agreements are not enforceable.

(See *Rodriguez*, *supra*, 176 Cal.App.4th at p. 1472.)  I therefore dissent.


HUFFMAN, Acting P. J.

8