Filed 7/14/21  Community Rebuild Partners v. Chanin CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| COMMUNITY REBUILD PARTNERS, LLC, et al.,<br><br>Plaintiffs and Respondents,<br><br>v.<br><br>SAM CHANIN, et al.,<br><br>Defendants and Appellants. | B302457<br><br>(Los Angeles County Super. Ct. No. LC105136) |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, C. Virginia Keeny, Judge.  Affirmed.

WLA Legal Services, Inc., Steven Zelig, for Defendants and Appellants.

Law Office of Baruch C. Cohen, Baruch C. Cohen, for Plaintiffs and Respondents.

# I. INTRODUCTION

The parties[1] to this unlawful detainer action filed cross-motions for summary judgment. The trial court granted sellers' motion, denied buyers' motion, and entered judgment entitling sellers to possession of a residential property located in Sherman Oaks (the property).

Buyers appeal from the orders on the cross-motions, arguing that their evidence established, as a matter of law, that they took possession of the property under a purchase agreement and were therefore not subject to eviction as tenants under the unlawful detainer statutes (Code Civ. Proc., § 1161, et seq.). In the alternative, buyers maintain that their evidence raised triable issues about whether they took possession of the property under a lease. We affirm.

---

[1] The named plaintiffs are Community Rebuild Partners, LLC, Community Rebuild Partners Asset Holdings, LLC, and Community Rebuild Partners (collectively "sellers"). The defendants are Sam and Lieba Chanin (collectively "buyers"). Because the buyers share the same last name, we will refer to them by their first name for purposes of clarity.

## II.  FACTUAL BACKGROUND[2]

A.  *Transactional Documents*

In May 2016,[3] Community Rebuild Partners, as "Seller," and Lieba, as "Buyer," entered into a California Association of Realtors form "Residential Purchase Agreement and Joint Escrow Instructions" for the purchase of the property (purchase agreement).  The total purchase price was $2,575,000.  The purchase agreement's financing terms called for an initial deposit into escrow of $100,000; a first loan in the amount of $2,060,000; and a balance of $415,000 to be deposited into escrow.  The purchase agreement also provided that escrow would close 180 days from acceptance of buyers' offer.

In paragraph 3-J of the purchase agreement, buyer was required to deliver to seller, within three days of the execution of that agreement, a lender's letter stating that buyer was preapproved for the loan amount of $2,060,000.

In paragraph 6, entitled "Other Terms," the purchase agreement provided:  "Buyer shall be moving into the property at

---

[2]    As explained below, although the parties filed cross-motions for summary judgment, this appeal turns on whether the trial court properly granted sellers' motion; if the court's order on sellers' motion was correct, buyers' motion was moot.  The facts are therefore based on those submitted in support of and in opposition to sellers' motion.

[3]    Lieba executed the purchase agreement on May 18, 2016, and Gregory Hebner, on behalf of Community Rebuild Partners, executed it on May 20, 2016.

the onset of escrow.  Buyer shall pay $18,000 a month for rent. $6,000 from each month's rent paid shall be credited towards the purchase price with a cap of $36,000 to be credited.  See attached interim occupancy agreement[.]"  (Original capitalized.)

At the same time they executed the purchase agreement, the parties also entered into a California Association of Realtors form "Interim Occupancy Agreement Buyer in Possession" (occupancy agreement).  The occupancy agreement identified Community Rebuild Partners as the "Seller/Landlord" and Lieba as the "Buyer/Tenant."  It recited that the parties had "entered into a purchase agreement for the . . . property . . . [and that the] escrow for [that] agreement [was] scheduled to [close in] 180 days . . . ."  The occupancy agreement next stated that "Seller, as Landlord, and Buyer, as Tenant, agree as follows:  [¶]  . . .  [¶] A.  Landlord rents to Tenant and Tenant rents from Landlord [the property] . . . .  [¶]  B.  The [property is] for the sole use as a personal residence by . . . [buyer and her family]."

The term of the occupancy agreement was to "begin[] on . . . June 1, 2016 ('Commencement Date') . . . and . . . terminate at 5:00 p.m. on the earliest of:  (a) the date scheduled for [the] close of escrow of the purchase agreement . . . , or (b) mutual cancellation of the purchase agreement.  Tenant shall vacate the [property] upon termination of [the occupancy agreement], unless:  (I) Landlord and Tenant have signed a new agreement, (II) mandated by local rent control law, or (III) Landlord accepts Rent from Tenant (other than past due Rent), in which case a month-to-month tenancy shall be created which either party may terminate pursuant to California Civil Code [section] 1946.1."

In paragraph 3, entitled "Rent," the occupancy agreement defined rent as "all monetary obligations of Tenant to Landlord

4

under the terms of this [a]greement, except security deposit." The agreement then provided that "Tenant agrees to pay $18,000 per month for the term of [the a]greement." The first month's rent of $18,000 was due by personal check on May 25, 2016. Paragraph 26 of the agreement, entitled "Possession," stated, "Tenant is not in possession of the [property,]" and listed remedies in the event "Landlord is unable to deliver possession within 5 . . . calendar days."

In paragraph 41, entitled "Other terms and conditions; Supplements[,]" the occupancy agreement provided "$6,000 of each month's rent shall go towards the purchase price with a cap of $36,000[.]" (Original capitalized.) The standard security deposit due under most residential leases, however, was not required under the occupancy agreement.

The parties also executed at the same time as the purchase agreement and occupancy agreement, a California Association of Realtors form "Addendum No.1" (addendum), which provided: "The following terms and conditions are hereby incorporated in and made [a] part of the: [purchase agreement] . . . . [¶] This addendum is not only incorporated into the attached purchase [agreement], but this addendum shall also superceed [sic] anything agreed upon in the purchase [agreement]. [¶] Buyer to deposit $100,000 at the opening of escrow. This deposit shall be released to the Seller 10 days after opening escrow, at which time Buyer shall remove their inspection contingency. Once a signed contingency removal is received by escrow, it shall serve as instruction to release the [nonrefundable] deposit to the Seller. [¶] Buyer to lease the house from Seller until [the] close of escrow. Close of escrow shall occur no later tha[n six] months from the fully executed purchase [agreement] date. Seller offers

5

the Buyer two, one month extensions at the end of [the] lease term, if needed in order to close escrow. [¶] Terms of the lease are as follows: [¶] Monthly rent shall be $18,000 a month. At the end of the lease term $6,000 of each month's rent shall be credited towards the purchase price with [the] cap on the credit of $36,000. [¶] Tenant/Buyer shall be responsible for all maintenance and wear and tear on the property. [¶] Tenant/Buyer shall be taking full responsibility of the property as if they have taken ownership of the home. Any modifications or repairs will be paid for by the Tenant/Buyer, and approved by the Seller. Buyer/Tenant will carry a homeowners insurance policy/renter[']s policy starting from the time of move-in. [¶] Any additional escrow, title costs, or transfer taxes above what would be for a purchase price of $2,575,000 shall be paid for by the Buyer." (Original capitalized.)

B.    *Sellers' Evidence*

Buyers took possession of the property on June 6, 2016, and have continuously occupied the property since that time. They timely paid monthly rent in the amount of $18,000 during the term of the occupancy agreement from June through December 2016.[4] Buyers did not exercise their option to extend the occupancy period an additional two months.

---

[4]    In her deposition, Lieba testified that buyers paid $18,000 for the month of December 2016, in addition to the $18,000 per month they were required to pay under the six-month term of the occupancy agreement from June through November 2016.

After December 2016, buyers ceased making monthly payments of $18,000.  Instead, they tendered $7,000 checks for the months of January, February, March, and April 2017, which sellers refused to accept.  From and after December 2016, buyers: failed to tender the purchase price for the property; failed to close escrow; failed to acquire title to the property; failed to pay or tender rent (after April 2017); did not vacate and return possession of the property; and did not offer to cancel the purchase agreement.

Based on buyers' representation that Lieba would purchase the property, Gregory Hebner, on behalf of the property's owner,[5] agreed to rent the property to buyers pending the close of escrow. Hebner would not have agreed to rent the property to buyers if he knew Lieba would not pay the purchase price and would not return the property at the end of the six-month occupancy period.

---

[5]     Community Rebuild Asset Holdings, LLC, is the company that has owned the property since November 2014.  Hebner is the sole owner and managing member of Community Rebuild Partners, LLC, which, in turn, owns a majority interest in and manages the property's owner.  The property's owner authorized Community Rebuild Partners to enter into the purchase agreement on its behalf.

C.    *Buyers' Evidence*[6]

In support of buyers' cross-motion, Lieba declared that: After reviewing a listing for the property, Lieba contacted the listing broker, Michelle Hirsh, and visited the property with her on two occasions. Following a home inspection of the property on her behalf by a home inspection company, Lieba decided to make an offer. She used Hirsh as buyers' broker and submitted an offer that included a term allowing her family to take possession of the property pending close of escrow. Sellers accepted buyers' offer which also included a deposit of $100,000 and payments of $18,000 per month "for possession of the [property]," $6,000 of which per month would be credited toward the purchase price. According to Lieba, "[s]eller demanded that [she] provide proof of funds for the down payment and a loan approval letter before he would allow [her family] to take possession."

Prior to executing the purchase agreement, the addendum, and the occupancy agreement, Lieba did not speak to anyone other than Hirsh concerning the negotiation of those documents. Specifically, she never discussed the creation of a landlord-tenant relationship between the parties and never intended to be a tenant; she only intended to purchase the property.

Sellers did not require Sam to execute a lease, even though he would be occupying the property with Lieba. And, as part of the purchase transaction, Lieba was required to show proof of

---

[6]    In their opposition to sellers' motion, buyers incorporated by reference the facts they submitted in support of their cross-motion. Those facts are therefore included in our recitation of buyers' evidence.

funds sufficient to complete the purchase of the property and to procure homeowners' insurance (which she was unable to obtain because title to the property was not in her name).

According to Lieba, she was unable to obtain a mortgage to complete the purchase of the property due to certain conduct by sellers. She therefore intended to vacate the property, but sellers refused to refund any portion of her deposit or the payments she had made in return for possession. Buyers therefore decided to sue sellers and to remain in possession of the property pending the outcome of their lawsuit. Although buyers offered to pay sellers $7,000 per month while their family remained in possession, sellers refused their offer.

In support of their cross-motion, buyers also submitted excerpts from the depositions of Hebner and Hirsh, as well as two declarations by Hebner. In his deposition, Hebner testified that he never spoke directly to buyers until after they had moved into the property. He assumed it was buyers' idea to take possession of the property under the occupancy agreement because that term was in their offer and Hirsh had told him buyers "needed a couple of months to get their mortgage in order." In his declarations, Hebner stated that he agreed to rent the property to buyers based on their representation that Lieba would purchase the property. He also confirmed that he would not have agreed to rent the property to buyers if he knew Lieba would not be able to pay the purchase price and would not return the property when the lease term was over.

In her deposition, Hirsh testified that Hebner told her what to include in the occupancy agreement and the addendum. She and Hebner worked on the occupancy agreement together and then presented it to buyers who made their own revisions. She

understood that buyers needed time to close the transaction, "but [that] they also needed a home to move into, and they wanted to move into [the property] prior to actually closing escrow, so . . . [the] occupancy agreement [was drafted] to allow [buyers] to move into the house and . . . pay a monthly amount, [a portion of] which . . . would go towards the purchase price once we closed escrow."

The last time Hirsh visited the property, the pool did not have a fence around it. Hirsh explained that when she sold a property, she did not necessarily recommend installing fencing directly around a pool if the home had other pool-safety features. But when she leased a property with a pool, she "would . . . tell the landlord . . . it would be a good idea to put a fence around the pool just as a[n] extra precaution . . . ."

## III.   PROCEDURAL BACKGROUND

A.   *Buyers' Lawsuit*

In March 2017, buyers sued sellers and others for fraud and various other causes of action. On April 23, 2021, we dismissed Lieba's appeal from one of the trial court's orders in that matter, under the disentitlement doctrine, finding that Lieba's refusal to comply with the court's order prevented her from seeking relief on appeal. (*Chanin v. Community Rebuild Partners et al.* (Apr. 23, 2021, B299188) [nonpub. opn.].)

B.      *Unlawful Detainer Complaint and Demurrers*

On January 9, 2017, sellers served Lieba with a three-day notice to pay rent or quit.

On January 23, 2017, sellers filed an unlawful detainer complaint against buyers seeking to summarily evict them from the property.  The complaint attached a copy of the occupancy agreement.

In May 2017, sellers filed a second amended unlawful detainer complaint, attaching, among other things, the purchase agreement and addendum.  Buyers demurred, and the trial court sustained the demurrer without leave to amend, ruling that "[t]he complaint shows no landlord[-]tenant relationship.  The remedy for [sellers] is ejectment."

In June 2017, the trial court entered a judgment of dismissal, from which sellers timely appealed.

C.      *Appeal and Remittitur*

In April 2019, this court issued an opinion reversing the judgment of dismissal, holding that "the transactional documents do not unambiguously demonstrate as a matter of law that buyers took possession of the property under the purchase agreement.  Instead, a fair reading of the allegations of the operative complaint and the attached documents shows sellers sufficiently pleaded that buyers initially took possession under a fixed-term lease that expired and that buyers were thereafter subject to eviction under Code of Civil Procedure section 1161 for unlawfully holding over.  The trial court therefore erred in

11

sustaining the demurrer." (*Community Rebuild Partners, LLC v. Chanin et al.* (Apr. 25, 2019, B284632) [nonpub. opn.].)

We added: "In finding that [buyers] have not shown at the pleading stage—as a matter of law—that they took possession under the purchase agreement and that [seller] has sufficiently pleaded possession pursuant to a lease, we do not express an opinion on the ultimate merits of the parties' respective contentions or the definitive interpretation of the transactional documents." (*Community Rebuild Partners, LLC v. Chanin et al., supra,* B284632.) We remanded the matter to the trial court with instructions to enter a new order overruling the demurrer. The remittitur issued on June 25, 2019.

D.      *Cross-Motions for Summary Judgment*

On August 8, 2019, sellers filed their third amended complaint for unlawful detainer. On August 27, 2019, sellers filed their motion for summary judgment and supporting papers and, the next day, buyers filed their cross-motion for summary judgment and supporting papers. The parties also filed opposing papers and replies.

On September 13, 2019, the trial court held a hearing on the cross-motions. Following argument, the court found that "the extrinsic evidence offered by [buyers] (other than the language of the contracts [themselves]) is insufficient to create a triable issue of fact as to whether the parties intended a buyer-seller arrangement. . . . [W]hen the three agreements are considered together, the language is unambiguous and creates a landlord[-]tenant relationship as a matter of law. [¶] There is no triable issue of fact as to the relationship and in fact, the court

12

concludes that . . . [buyers] are tenants and unlawful detainer is an allowable remedy."

On September 24, 2019, the trial court entered a judgment in favor of sellers from which buyers timely appealed.

## IV.   DISCUSSION

### A.   *Disentitlement Doctrine*

As we discuss above, we have already concluded, in case number B299188, that Lieba's conduct in the buyers' lawsuit supported the application of the disentitlement doctrine to dismiss her appeal from that trial court's order confirming the arbitrator's order.  For the reasons we discuss in case number B299188, we dismiss Lieba's appeal under the disentitlement doctrine.  (See *Stoltenberg v. Ampton Investments, Inc.* (2013) 215 Cal.App.4th 1225, 1233–1234 [disentitlement doctrine applied to appellant who was in violation of orders issued by a trial court from a different jurisdiction].)

Because Sam, however, was not a party to the prior appeal and is an appellant here, we decline to exercise our discretion to further apply the doctrine to his appeal.

### B.   *Sam Forfeited Arguments on Appeal*

Although Sam is a named appellant in this appeal, he was not a signatory to any of the transactional documents at issue on appeal.  Further, Sam conceded in the trial court that he did not have an independent basis for remaining on the property and would therefore vacate the property if judgment of possession

13

was entered against Lieba.[7]  On this record, we conclude that Sam forfeited any argument that he had an independent basis to possess the property.  In any event, even if Sam had not forfeited his arguments on appeal, we would reject them on the merits for the reasons we discuss below.

## C.    *Prior Opinion Reversing Demurrer*

Sam maintains that our prior opinion reversing the trial court's ruling on demurrer, case number B284632, determined that the transactional documents were ambiguous on the issue of whether they created a landlord-tenant relationship.  According to Sam, that determination is "law of the case" and was binding on the trial court.  (*Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 491.)  We disagree.

As we describe above, in our prior opinion, we reversed the trial court's ruling sustaining buyers' demurrer to the unlawful detainer complaint, holding that sellers had adequately alleged the existence of a landlord-tenant relationship and the transactional documents attached to the complaint did not contradict those allegations by showing, unambiguously, that

---

[7]    During the hearing on the cross-motions for summary judgment, the trial court inquired whether a judgment of possession against Sam would be appropriate.  In response, his counsel stated:  "The reality is . . . that if judgment of possession is given against Lieba [], Sam [] and the children will be leaving also together.  So that's really not an issue.  And it's never been an issue."  The court therefore entered a judgment of possession against both Lieba and Sam.

14

buyers took possession of the property under the purchase agreement.

Contrary to Sam's assertion, we did not hold that the documents were ambiguous on the issue of whether buyers took possession under a lease; nor were we required to do so under the procedural posture of that case. Instead, we concluded only that, at the pleading stage, sellers had alleged sufficient facts to state a cause of action for unlawful detainer. We expressly declined to state any opinion on the definitive interpretation of the transactional documents. The trial court was therefore not bound by our decision—under the law of the case or otherwise—to conclude that the language of the documents was ambiguous on the creation of a tenancy.

D.    *Summary Judgment in Unlawful Detainer*

    1.    <u>Standard of Review</u>

Our review of the trial court's rulings on the cross-motions for summary judgment[8] is governed by well-established principles. "'"A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); see also *id*., § 437c, subd. (f) [summary

---

[8]    In an unlawful detainer action, a "motion for summary judgment may be made at any time after the answer is filed upon giving five-days notice. Summary judgment shall be granted or denied on the same basis as a motion under [Code of Civil Procedure s]ection 437c." (Code Civ. Proc., § 1170.7.)

15

adjudication of issues].)"'"" (*State of California v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1017.) "We review the trial court's decision [on a summary judgment motion] de novo, considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports. [Citation.]" (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.)

"In moving for summary judgment, a 'plaintiff . . . has met' his 'burden of showing that there is no defense to a cause of action if' he 'has proved each element of the cause of action entitling' him 'to judgment on that cause of action. Once the plaintiff . . . has met that burden, the burden shifts to the defendant . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The defendant . . . may not rely upon the mere allegations or denials' of his 'pleadings to show that a triable issue of material fact exists but, instead,' must 'set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto.' (Code Civ. Proc., § 437c, subd. (o)(1).)" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849.)

### 2. Unlawful Detainer Statutes

"'Unlawful detainer actions are authorized and governed by state statute. (Code Civ. Proc., § 1161 et seq.) The statutory scheme is intended and designed to provide an expeditious remedy for the recovery of possession of real property.' (*Larson v. City and County of San Francisco* (2011) 192 Cal.App.4th 1263, 1297 . . . , citing *Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 151 . . . .) 'The remedy is available in only three situations:

16

to a lessor against a lessee for unlawfully holding over or for breach of a lease; to an owner against an employee, agent, or licensee whose relationship has terminated; and to a purchaser at an execution sale, a sale by foreclosure, or a sale under a power of sale in a mortgage or deed of trust against the former owner and possessor.' (*Greene v. Municipal Court* (1975) 51 Cal.App.3d 446, 450 . . . (*Greene*).) Unlike the foregoing situations, '[a] vendee in possession of land under a contract of sale who has defaulted in the payment of an installment of the purchase price, is not subject to removal by the summary method of unlawful detainer.' (*Id.* at p. 451; see *Francis v. West Virginia Oil Co.* (1917) 174 Cal. 168, 169–171 . . . ; *Goetze v. Hanks* (1968) 261 Cal.App.2d 615, 617 . . . .)" (*Taylor v. Nu Digital Marketing, Inc.* (2016) 245 Cal.App.4th 283, 288–289.)

Sellers' third amended unlawful detainer complaint alleged that buyers continued in possession of the property after the expiration of the six-month term of the interim occupancy agreement. They therefore sought recovery of possession under Code of Civil Procedure section 1161, subdivision 1.[9] That section makes the continuation of a tenant's possession after expiration of the term a form of unlawful detainer for which the landlord may recover possession in summary proceedings. (*Fisher v. City of Berkley* (1984) 37 Cal.3d 644, 706.)

---

[9] Code of Civil Procedure section 1161 provides, in pertinent part: "A tenant of real property, for a term less than life . . . is guilty of unlawful detainer: [¶] 1. When the tenant continues in possession, in person or by subtenant, of the property, or any part thereof, after the expiration of the term for which it is let to the tenant . . . ."

17

Thus, to prevail on their cause of action for unlawful detainer, sellers were required to show that: (1) buyers were tenants under a fixed-term lease; (2) the lease had expired; and (3) buyers were holding over.

### 3. Rules of Contract Interpretation

Under the rules of contract interpretation, "we first consider the mutual intention of the parties at the time the contract . . . was formed. (Civ. Code, § 1636.) Our initial inquiry is confined to the writing[s] alone. (*Id.*, § 1639; [Citation.].) "'The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' (*Id.*, § 1644), controls judicial interpretation. (*Id.*, § 1638.) Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. [Citations.]'" [Citation.] At the same time, we also recognize the 'interpretational principle that a contract must be understood with reference to the circumstances under which it was made and the matter to which it relates. ([*Id.*], § 1647).' [Citation.]" (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 752.) Thus, "'[w]e consider the contract as a whole and interpret its language in context so as to give effect to each provision, rather than interpret the contractual language in isolation. [Citation.]'" (*Wind Dancer Production Group v. Walt Disney Pictures* (2017) 10 Cal.App.5th 56, 69.)

"Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms. (Civ. Code, § 1639 ['[w]hen a contract is reduced to

writing, the intention of the parties is to be ascertained from the writing alone, if possible . . .']; Civ. Code, § 1638 [the 'language of a contract is to govern its interpretation . . .'].) [¶] The court generally may not consider extrinsic evidence of any prior agreement or contemporaneous oral agreement to vary or contradict the clear and unambiguous terms of a written, integrated contract. (Code Civ. Proc., § 1856, subd. (a); *Cerritos Valley Bank v. Stirling* (2000) 81 Cal.App.4th 1108, 1115–1116 . . . ; *Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman* (1998) 65 Cal.App.4th 1469, 1478 . . . [parol evidence may not be used to create a contract the parties did not intend to make or to insert language one or both parties now wish had been included].) Extrinsic evidence is admissible, however, to interpret an agreement when a material term is ambiguous. (Code Civ. Proc., § 1856, subd. (g); *Pacific Gas & Electric* [*Co. v. G.W. Thomas Drayage etc. Co.* (1968)] 69 Cal.2d [33,] 37 [(*Pacific Gas & Electric*)] [if extrinsic evidence reveals that apparently clear language in the contract is, in fact, susceptible to more than one reasonable interpretation, then extrinsic evidence may be used to determine the contracting parties' objective intent]; *Los Angeles City Employees Union v. City of El Monte* (1985) 177 Cal. App.3d 615, 622 . . . .)" (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126.)

4. Analysis

As noted, the dispositive issue on appeal is whether sellers established, as a matter of law, that buyers possessed the property as tenants. If they did, then Hebner's declaration testimony in support of sellers' motion showed that the six-month

19

term of the occupancy agreement expired in December 2016, and that buyers were hold overs from and after that point. Sellers therefore satisfied their burden of proving the other elements of the unlawful detainer cause of action, and buyers do not contend otherwise. We thus interpret the transactional documents to determine whether they created a landlord-tenant relationship.

### a. Transactional documents are not ambiguous

As we have already concluded in our prior opinion, the transactional documents at issue here sufficiently demonstrated that the buyers took possession of the property pursuant to a lease and also demonstrated that they did not, as a matter of law, take possession under the purchase agreement.

The purchase agreement and addendum included numerous references to the terms, "rent," "monthly rent," "each month's rent," "lease," "terms of the lease," and "lease term." Those terms, as commonly understood, are clear and explicit, and strongly suggest that buyers would be tenants during the escrow period prior to their acquisition of title.

Further, the occupancy agreement—which was a separate document prepared to express the parties' respective rights and obligations during the interim occupancy—also used the terms "rent," "past due rent," and "each month's rent" and specifically defined the parties as "Tenant" and "Landlord," and those terms were used consistently throughout the agreement to identify the parties. Those terms are not unfamiliar to laypersons and would be commonly understood by them to refer to the parties to a lease, as distinguished from a purchase agreement.

20

The occupancy agreement also recited, in a paragraph entitled "Possession," that the "Tenant" was not yet in possession of the property, and that if the "Landlord" was unable to deliver possession within five days of the commencement date, the tenant could terminate the agreement. That provision directly linked buyers' possession of the property to the occupancy agreement, independent of any rights buyers may have had under the purchase agreement. Thus, the language of the transactional documents, and in particular the occupancy agreement, clearly and explicitly evinces an intent to create a landlord-tenant relationship.

Sam counters that the transactional documents are ambiguous, but does not explain how the repeated use of terms like "Landlord," "Tenant," "Rent," "rent to," "rent from," "Lease," "Lease Term," and "tenancy," when understood in their ordinary and popular sense, could describe to a layperson anything other than a landlord-tenant relationship. Nor does he explain how those terms, as applied in the context of the purchase transaction, could be susceptible to more than one meaning. (See *Dore v. Arnold Worldwide, Inc*. (2006) 39 Cal.4th 384, 391 (*Dore*) [An ambiguity arises when language is reasonably susceptible of more than one application to material facts].)

Instead, Sam contends that the transactional documents contain certain other provisions which, on their face, raise an ambiguity concerning the parties' intent to lease the property. For example, Sam argues that the $100,000 deposit required under the purchase agreement, when combined with the $6,000 per month payments toward the purchase price required under the occupancy agreement, were inconsistent with an intent to lease. Although those provisions, in isolation, may have

21

suggested the existence of a vendee relationship (see *Greene, supra,* 51 Cal.App.3d at p. 451), we do not read the provisions in isolation, but instead consider them in the context of all the transactional documents (see *Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 39–40).  Thus, although the purchase agreement required a $100,000 deposit, it did not tie that deposit to buyers' ability to possess the property.[10]  Instead, the deposit was part of the financing terms for the purchase. Further, that the transactional documents allowed a portion of the rent to be credited against the purchase price "does not, in and of itself, transfer possession from a landlord-tenant relationship to one of purchaser and seller." (*Provouskivitz v. Snow* (1977) 74 Cal.App.3d 554, 533.)  At best, those two provisions demonstrate that the parties agreed to both the eventual sale of the property and a six-month lease, which does not defeat the existence of a landlord-tenant relationship.  (*Ibid.*)

Sam also contends that the addendum's provision requiring buyers to maintain and repair the property during the escrow is fundamentally inconsistent with the creation of a tenancy. Citing to a landlord's nondelegable duties under the implied warranty of habitability, Sam maintains that the provision

---

[10]    Sam maintains that buyers were required, as a condition of *occupancy*, to show proof that they could pay the $100,000 down payment and fund the purchase of the property.  But the transactional documents do not support that assertion; in fact, the purchase agreement independently required buyers to show preapproval of the required loan amount and also required Lieba to represent that the funds for the deposit "would be good when deposited."  Neither the addendum nor the occupancy agreement had such requirement.

22

shifting those duties to buyers is inconsistent with an intent to create a tenancy and instead shows that the parties intended that buyers' interim occupancy would be as owners, not tenants. And, according to Sam, the fact that Hirsh did not recommend that sellers place a fence around the pool is contrary to a finding that the parties entered into a lease. We disagree.

That sellers sought to delegate a nondelegable obligation to maintain the property and did not place a fence around the pool may suggest that sellers were overreaching and lacked caution, but do not demonstrate that they intended buyers to possess the property as owners. To the contrary, that sellers attempted to shift obligations they would otherwise be required to undertake as landlords is entirely consistent with the parties' understanding that sellers *were* landlords, at least during the six-month period of the occupancy agreement. Moreover, the provision that "Tenant/Buyer shall be taking full responsibility of the property *as if* they have taken ownership of the [property]" (italics added), acknowledged that the buyers would not, *in fact*, take such ownership. And, that Hirsh, who was not a party to the transactional documents, did not advise sellers to place a fence around the pool was consistent with the intent of the parties to enter into both a purchase agreement and a six-month lease during the escrow period.

Finally, Sam emphasizes that he did not execute the occupancy agreement and concludes that such an omission is inconsistent with an intent to create a tenancy. According to Sam, a landlord in sellers' position would have required Sam to be bound under the lease along with Lieba. But Sam does not explain why this is so or support his assertion with legal authorities or citations to the record. We thus reject that

23

argument as waived.  (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856.)

None of the provisions of the transactional documents cited by Sam, when considered in the context of the agreements as a whole, suggest that the numerous references to the terms, "rent," "monthly rent," "lease," "lease terms," "landlord," and "tenant," were anything but a clear and unambiguous description of a six-month lease.

b.      Extrinsic evidence

"'Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible.' [Citation.]  'The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is . . . whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.'"  (*Dore, supra*, 39 Cal.4th at p. 391.)  And, as explained above, once extrinsic evidence reveals that apparently clear language in the contract is susceptible to more than one reasonable interpretation, then extrinsic evidence may be used to determine the contracting parties' objective intent.  (*Pacific Gas & Electric, supra*, 69 Cal.2d at p. 37.)

In an apparent attempt to satisfy his burden to show that there was a triable issue of material fact on the issue of whether buyers possessed the property under the terms of a six-month lease, Sam relies on extrinsic evidence, without specifying whether he is using it to show a latent ambiguity in the documentation or, instead, to shed relevant light on the parties'

true intention under those agreements. We will assume, for the sake of argument, that buyers' extrinsic evidence was proffered for both purposes, and thus consider all their extrinsic evidence. We nevertheless conclude that buyers failed to show either a latent ambiguity or a triable issue of fact regarding the parties' objective intent on the lease issue.

As Lieba explained to Hirsh, buyers needed six-months to obtain financing, close escrow, and acquire title. But they also needed a place to live during that time and wanted to move into the property. Under those circumstances, the creation of a six-month fixed-term tenancy was wholly consistent with buyers' needs and desires; and, delivering them possession without such a tenancy in place would have been inconsistent with their present lack of funding to close the purchase transaction.

Moreover, Lieba's testimony that she never intended to enter into a lease transaction, and always intended to purchase the property, was also irrelevant to the issue of the parties' mutual intent. As she admitted, she never spoke to anyone about the creation of a tenancy. Thus, her subjective, unexpressed intentions about the parties' transaction could not operate to show that the language of the documents describing a tenancy was reasonably susceptible to some different meaning. (*Reigelsperger v. Siller* (2007) 40 Cal.4th 574, 579–580; *Bryant v. California Dairies, Inc.* (1935) 4 Cal.2d 128, 133.)

In addition, Lieba's conclusory testimony that sellers demanded, as a precondition to occupancy, that she show proof of funds for the loan and the deposit was insufficient to show an ambiguity in the documents because she was already obligated under the purchase agreement to show proof of funds for the loan and to represent that the funds for the deposit would "be good

25

when deposited with the [e]scrow [h]older." Nor was that testimony sufficient to raise a triable issue on the parties' intent to lease because demanding proof of funds before agreeing to a tenancy was reasonable to ensure that buyers would be able to close as represented once the lease term expired.

Moreover, none of the "admissions" attributed to sellers had any tendency to show that they intended to allow buyers to occupy the property as owners during the escrow period. For example, buyers emphasize Hebner's testimony that they requested interim occupancy as part of their offer to purchase the property. That testimony, which was generally consistent with Lieba's and Hirsh's concerning the parties' negotiations, shed no light on the means by which that occupancy would ultimately be permitted. The only evidence on that issue was the language of the subsequently drafted documents that clearly described possession as tenants.

Similarly, Hebner's testimony that he would not have agreed to rent the property to Lieba if he knew she would be unable to pay the purchase price and would not return the property to him was not inconsistent with an intent to rent. And, it was irrelevant in any event as his unexpressed state of mind.

Likewise, Hirsh's testimony that she negotiated the right to interim occupancy because Lieba and her family needed a place to live and needed extra time to close escrow merely corroborated the undisputed facts, but did not suggest or imply an intent on behalf of the parties that was different from the one expressed in the subsequently drafted documents.

Finally, the fact that sellers allowed buyers to inspect the property before making an offer on it was not relevant to, much less inconsistent with, the parties' subsequent intent to create a

26

fixed-term tenancy to accommodate buyers' need for a place to live during the extended escrow period.  Instead, their inspection of the property showed only that they intended to proceed with the potential purchase of the property, a fact that was consistent with an intent to rent the property during that escrow.

The trial court therefore did not err in concluding that, based on the evidence submitted by the parties, sellers were entitled to judgment on their unlawful detainer as a matter of law.

## V.    DISPOSITION

The judgment is affirmed.  Plaintiffs are awarded costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


KIM, J.


We concur:


BAKER, Acting P. J.


MOOR, J.